949 So.2d 994 (2006)
Antonio MELTON, Appellant,
v.
STATE of Florida, Appellee.
Antonio Lebaron Melton, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-1689, SC05-1423.
Supreme Court of Florida.
November 30, 2006.
Rehearing Denied February 15, 2007.
*999 D. Todd Doss, Lake City, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Melton appeals an order of the circuit court denying his motion to vacate his sentence of death filed under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the circuit court's order denying postconviction relief and we deny Melton's habeas petition.

*1000 FACTS AND PROCEDURAL HISTORY
The facts of this crime are set forth in our opinion from Melton's direct appeal:
Melton was convicted of fatally shooting George Carter during a robbery of Carter's pawn shop in Pensacola. Jurors found Melton guilty of first-degree felony murder and armed robbery. They recommended death for the murder conviction by an eight-to-four vote. The trial judge followed the jury's recommendation and sentenced Melton to death. We affirm the convictions and sentences.
The record shows that Melton and a friend, Bendleon Lewis, entered Carter's pawn shop, planning to rob it. Melton and Lewis each testified that the other planned the robbery.
Lewis was granted use immunity to testify for the State. He testified that once in the pawn shop, he feigned an interest in pawning a necklace. While Carter weighed the necklace, Lewis testified that he grabbed Carter's arm and Melton pulled a gun he was carrying in his pants. Melton held the gun on Carter while Lewis gathered jewelry and guns from the shop. As Lewis tried to unlock a door so he and Melton could flee, he heard a gunshot.
Melton testified that while Lewis talked to Carter about jewelry, he put on surgical gloves and reached to pick up a ring. He testified that Carter saw him try to pick up the ring and reached for a gun he was carrying. Lewis grabbed Carter's hands, while Melton pulled his own pistol and took Carter's gun. Melton said while he held his gun on Carter, Carter rushed at him, then fell and hit his head. Melton testified that he told Carter to remain still, but Carter pushed up from the floor and grabbed for the hand with the gun. As the two struggled over the gun, the weapon discharged and hit Carter in the head. Police arrested Melton and Lewis as they were leaving the shop.
Although there was conflicting testimony about who planned the robbery and whether there was a struggle before Carter was shot, the evidence is clear that Melton held a .38-caliber gun on Carter and fired the fatal shot.
In sentencing Melton to death, the trial judge found two aggravating factors: (1) Melton was previously convicted of a violent felony (first-degree murder and robbery) and (2) Melton committed the homicide for financial gain. The trial judge found two nonstatutory mitigating factors, but assigned them little weight: (1) Melton exhibited good conduct while awaiting trial and (2) Melton had a difficult family background. The judge also sentenced Melton to life imprisonment for the robbery conviction.
Melton v. State, 638 So.2d 927, 928-29 (Fla.1994). This Court affirmed Melton's conviction and death sentence, and the United States Supreme Court denied certiorari review. Melton v. Florida, 513 U.S. 971, 115 S.Ct. 441, 130 L.Ed.2d 352 (1994).
In a separate case, Melton was also convicted of the armed robbery and first-degree felony murder of Ricky Saylor, a taxicab driver, and was sentenced to life imprisonment on each offense with the sentences to run consecutively. On direct appeal, the First District affirmed both convictions and sentences. See Melton v. State, 611 So.2d 116 (Fla. 1st DCA 1993). This Court declined to exercise jurisdiction and denied Melton's petition for review. See Melton v. State, 624 So.2d 267 (Fla. 1993). These convictions served as the basis for the trial court's finding of the prior violent felony aggravator in this case.
*1001 Melton filed postconviction motions in both this case and the Saylor case. Melton filed his original 3.850 motion in the instant case in January of 1996, and filed an amended motion in July of 2001. A Huff[1] preliminary hearing was held in October of 2001; Melton then filed a second amended 3.850 motion two days before the evidentiary hearing was scheduled. The evidentiary hearing addressed issues concerning both the Carter/"pawn shop" murder and Melton's postconviction claims filed regarding the Saylor/"taxi cab" murder. The circuit court issued its order denying relief on all claims in both the Carter and Saylor cases on March 23, 2004. The First District subsequently affirmed the circuit court's order in the Saylor case. Melton v. State, 909 So.2d 865 (Fla. 1st DCA 2005).

POSTCONVICTION CLAIMS
Melton argues on appeal that the lower court erred in denying postconviction relief regarding: (1) his claim that he was denied the effective assistance of counsel during both the guilt phase and penalty phase of his trial; (2) his claim that the State withheld material and exculpatory evidence and presented misleading evidence; (3) his newly discovered evidence claim; (4) his claim that the prosecutor's misconduct during the course of his case rendered Melton's conviction and sentence fundamentally unfair and unreliable; and (5) his claim that there was unconstitutional systematic exclusion of a significant portion of the nonwhite population from the jury pool. Melton also raises a claim that the lower court improperly considered Melton's "lack of remorse" in its order denying relief.[2]

I. Ineffective Assistance of Counsel
Melton asserts that the trial court erred in rejecting his claim that he was denied the effective assistance of counsel during both the guilt and penalty phases of his trial. Melton claims that at the guilt phase of his trial, counsel could have obtained information that could have been used to impeach witness Bendleon Lewis's testimony and, furthermore, counsel was deficient for failing to adequately investigate the true nature and extent of Lewis's negotiations with the State. Melton also alleges that trial counsel was ineffective during the penalty phase of his trial because his attorney failed to present evidence of compelling and substantial mitigating circumstances and, furthermore, counsel failed to provide Melton with a competent psychiatric evaluation. Melton further argues that trial counsel failed to sufficiently challenge the weight of his prior violent felony conviction in front of the jury, which was particularly prejudicial because there were only two aggravating circumstances presented at trial.
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. *1002 Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Downs v. State, 453 So.2d 1102 (Fla.1984)). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).
There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. In Occhicone v. State, 768 So.2d 1037 (Fla.2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Id. at 1048 (citing Rutherford v. State, 727 So.2d 216, 223 (Fla.1998); State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987)). We have also held that where this Court previously has rejected a substantive claim on the merits, "[c]ounsel cannot be deemed ineffective for failing to make [a] meritless argument." Melendez v. State, 612 So.2d 1366, 1369 (Fla.1992).
Attorney Terry Terrell represented Melton during trial in both the instant case and in the Saylor/"taxi cab" case. Melton's concerns about counsel's performance during the guilt phase of his trial focus on the testimony of two witnesses presented at the evidentiary hearing below, both of whom testified that Ben Lewis told them versions of the Carter murder that differed from Lewis's testimony at trial.
Paul Sinkfield, an inmate at the Wakulla Correctional Institution, testified that he knew Ben Lewis from "the streets," where they both sold drugs; he also stated that he and Lewis were cellmates in the Escambia County Jail in late 1990 and 1991, and that Lewis confessed to robbing and killing a cab driver with Tony Houston. He also related Lewis's version of the Carter murder: that Lewis was holding the gun, that he and Carter were struggling, and that the gun went off after Melton came over to assist Lewis. Sinkfield further testified that, at the time of Melton's original trial, no one came and asked him questions about Lewis's version of events; however, he stated that, if they had, he probably would not have disclosed Lewis's confessions because he "had other things to worry about." On cross-examination, he clarified that he never came forward with this information because no one ever asked him, and also that he had never shared the information with Melton even though he later met Melton in jail.
The defense also called Fred Harris, Jr., an inmate at the state prison in Cross City, who testified that he was also an inmate at the Escambia County jail in the *1003 early 1990s and that he knew Ben Lewis at that time. Harris stated that Lewis told him that Lewis, Carter, and Melton were all struggling when the gun went off, killing Carter. Harris also testified that Lewis told him at the time that he was going to tell the authorities that Melton was the triggerman in the pawnshop case. Harris stated that someone from the Public Defender's office came to see him in 1995, but that Harris would not talk to him because he did not want to get involved in the case. Harris also testified that, had someone come and tried to talk to him in 1991, he would not have revealed any of Lewis's confessions because they were close friends. On cross-examination, Harris clarified that according to Lewis, it was Carter's gun that discharged, killing him. He testified that he has "around twelve" felony convictions.
In denying this claim, the court below first discounted the credibility of these two witnesses and also found that any evidence attempting to establish that Lewis shot Carter would be contrary to Melton's own testimony given during trial in which he admitted killing the victim. The trial court, noting that it was unreasonable to suggest that defense counsel has an obligation to utilize finite time and resources to search out unknown or unnamed individuals simply because they are located in jail with a potential witness, further concluded that trial counsel was not deficient and was justified in his actions, including trial strategy and tactics, in the guilt phase.
We conclude that the trial court did not err in the denial of relief on this claim. Aside from hearsay concerns,[3] we note that both Sinkfield and Harris actually testified that they would not have cooperated with Melton's defense had they been asked around the time of his trial. In Nelson v. State, 875 So.2d 579 (Fla.2004), this Court held that "[i]f a witness would not have been available to testify at trial, then the defendant will not be able to establish deficient performance or prejudice from counsel's failure to call, interview, or investigate that witness." Id. at 583 (footnote omitted). Nelson specifically establishes that, "as part of the requirement to show that counsel's ineffectiveness prejudiced the defendant's case, a facially sufficient postconviction motion alleging the ineffectiveness of counsel for failing to call certain witnesses must include an assertion that those witnesses would in fact have been available to testify at trial." Id. at 584.
Melton seems to suggest only that these witnesses existed, and that perhaps they could have been called at trial. However, *1004 he presented no evidence suggesting how counsel would have been aware of these witnesses or their testimony. Further, as noted above, both individuals expressly testified at the evidentiary hearing below that they would not have cooperated or given any testimony against Lewis at that time, essentially making them "unavailable" for the purposes of Melton's trial. We find no error in the lower court's conclusion that trial counsel was not ineffective in failing to pursue these witnesses in preparation for the guilt phase of Melton's trial.[4]
Regarding Melton's claims that counsel was ineffective during the penalty phase of his trial, the trial court concluded that, while Terrell did not spend an extensive amount of time in the investigation and preparation of mental-health-related mitigation evidence for Melton's penalty phase, postconviction counsel was unable to establish at the evidentiary hearing below that trial counsel failed to uncover or present any additional evidence that would have affected the ultimate outcome. Specifically, the trial records indicate that Terrell called seven witnesses during mitigation, including both Melton's mother and father, who testified regarding Melton's childhood and upbringing. Terrell also called Dr. Lawrence Gilgun, the clinical psychologist retained to perform an evaluation of Melton. Although Dr. Gilgun was retained only one week prior to trial and only met with Melton once, he was still able to perform an examination and to testify, specifically concluding that he found Melton to be of normal intelligence with an IQ score of 90, placing him in the twenty-fifth percentile of the general adult population. Dr. Gilgun further testified during Melton's penalty phase that Melton suffered from no major psychiatric disorder or emotional defect. These conclusions were basically confirmed at the evidentiary hearing below by Dr. Henry Dee, the clinical psychologist retained by postconviction counsel. Dr. Dee, who met with Melton twice in preparation for the evidentiary hearing and also met with Melton's mother, father, and aunt, agreed that Melton evidences no sign of significant impairment of cognitive functioning due to cerebral disease, insult, or injury.
Melton further argues that defense counsel failed to paint a complete picture of Melton's life for the jury, specifically regarding evidence of his unusual and isolated childhood. However, the record supports the trial court's conclusion that extensive evidence of any relevant mitigation was presented to the jury and the trial court during Melton's penalty phase. For example, although Dr. Gilgun himself did not testify as to the specific nature of Melton's upbringing, Terrell presented both of Melton's parents at the penalty phase, who offered testimony regarding Melton's lack of a father figure, the strict religious environment at home, Melton's abusive stepfather, and Melton's choice to leave home at the age of sixteen. Other witnesses testified as to Melton's sheltered childhood, the dangerous environment in which he was raised, and the fact that he lived basically on his own after leaving home. In addition to Dr. Gilgun's testimony on the subject, Melton himself offered testimony as to his problems with drugs and alcohol beginning in the ninth grade.
In sum, while the additional evidence presented at the evidentiary hearing certainly could have been offered at trial to paint a more complete picture of Melton's *1005 childhood, we find no error in the trial court's conclusion that the evidence presented below essentially mirrors the evidence presented by trial counsel during the penalty phase. We find no error in the trial court's assessment that the additional mitigation presented at the evidentiary hearing does not undermine confidence in the ultimate outcome of the proceedings.
Melton next argues that trial counsel was ineffective for failing to "challenge the weight" of the prior violent felony aggravator. In other words, Melton asserts that, had Terrell conducted an adequate investigation, he would have been able to neutralize the weight of the prior violent felony to the jury, who in turn would not have sentenced Melton to death. Melton bases this claim on testimony given at the evidentiary hearing below by several Escambia County inmates regarding statements made by Ben Lewis about his involvement in the Saylor murder, essentially exculpating Melton and implicating Lewis.[5]
Melton presented these same jailhouse witnesses as part of his postconviction claim in relation to the Saylor murder conviction, arguing that trial counsel was ineffective for failing to discover these inmates as a part of his defense in that trial. In rejecting this claim, the trial court found that these witnesses lacked credibility and gave inconsistent statements, and furthermore that trial counsel could not be faulted for failing to use time and resources to ferret out these unknown jailhouse witnesses. After expanded briefing and oral argument, the First District recently affirmed the trial court's order denying postconviction relief in the Saylor murder. See Melton, 909 So.2d at 865. We agree with the State that Melton may not relitigate the Saylor murder conviction in these proceedings.
We further conclude that the argument is also without merit for the reasons cited by the trial court. Melton also cites to Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), for the proposition that trial counsel can be found ineffective for failing to review the circumstances of a prior violent felony conviction which the State planned to introduce as an aggravator. In Rompilla, the Supreme Court held that an attorney is obligated to obtain and review material that defense counsel knows the State is planning to use in establishing aggravation. Id. at 2461. Among other shortcomings, defense counsel in that case failed to examine Rompilla's prior conviction file even though it was clear the State would rely upon those convictions in the penalty phase. Id. at 2464. The Court, in finding ineffective assistance of trial counsel, noted, "[I]t is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation." Id. at 2465. In response to the government's argument that further investigation into these past crimes would have been fruitless since the convictions were only being introduced to establish the "prior violent crime" aggravator, the Court found:
[Such an] analysis ignores the fact that the sentencing jury was required to weigh aggravating factors against mitigating factors. We may reasonably assume that the jury could give more relative weight to a prior violent felony *1006 aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest.
Id. at 2465 n. 5. In this case, however, the record reflects that, despite Melton's assertions to the contrary, trial counsel clearly attempted to "challenge the weight" of Melton's prior felony conviction, thus complying with the standards articulated in Rompilla.
First and foremost, Terrell represented Melton in both the Carter and the Saylor trials, giving him an intimate familiarity with the circumstances and legal consequences of each case. Furthermore, a review of the original record from Melton's penalty phase in the Carter trial makes abundantly clear that defense counsel attacked the validity of the Saylor conviction in front of the jury. Specifically, when the State called Joseph Schiller, the prosecutor from the Saylor trial, to present evidence of Melton's prior conviction, the transcripts demonstrate that Terrell vigorously challenged Schiller regarding Lewis's testimony in the Saylor case, asking detailed questions regarding the nature of Lewis's relationship with the State, pointing out inconsistencies in witness testimony, and making other attacks on that conviction.[6] Therefore, this case can be distinguished from Rompilla since trial counsel clearly attempted to mitigate the previous conviction in front of the jury.
To the extent that Melton is now claiming that the prior Saylor conviction is invalid or that his trial counsel was ineffective for failing to chase down leads that would have acquitted him on this charge, it is clear that this conviction is final and was properly invoked as an aggravator in this case. The First District has concluded that the conviction should stand on review of both the initial proceedings and postconviction proceedings. Thus, for the purposes of the instant proceedings, Melton has a valid prior violent felony conviction.

II. Brady and Giglio Violations
Melton next argues that the trial court erred in rejecting his claim that the State withheld material and exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Melton also claims that that the State presented misleading evidence that is sufficient to undermine confidence in the outcome of his trial in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
Brady requires the State to disclose material information within its possession or control that is favorable to the defense. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidence  either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Way v. State, 760 So.2d 903, 910 (Fla. 2000).
To meet the materiality prong, the defendant must demonstrate a reasonable probability that, had the suppressed evidence been disclosed, the jury would *1007 have reached a different verdict. Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Way, 760 So.2d at 913 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); see also Strickler, 527 U.S. at 289-90, 119 S.Ct. 1936. A similar standard is used to evaluate prejudice in an ineffective assistance of counsel claim. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The remedy of retrial for the State's suppression of evidence favorable to the defense is available when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).
Giving deference to the trial court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of the alleged suppressed evidence. See Mordenti, 894 So.2d at 169; Way, 760 So.2d at 913.
Melton's Brady allegations are in relation to evidence allegedly withheld in the Saylor murder case, specifically concerning the testimony of Officer Thomas O'Neal, who was assigned to investigate the homicide of Ricky Saylor. At the evidentiary hearing below, postconviction counsel asked Officer O'Neal numerous questions regarding his interviews with Bruce Frazier, Ben Lewis, and an individual thought to be named "Summerlin," though he was later confirmed to be named "Sumler," all three individuals being jail inmates and interviewed in reference to the Saylor murder.[7] Melton also asserts that the State failed to disclose evidence of negotiations and anticipated deals with Melton's codefendants in the Saylor case, which could have been used for impeachment purposes. Melton points to Terrell's testimony at the evidentiary hearing in which he states that, had he known of additional contact between Lewis and the State Attorney's Office in the Saylor case, he would have presented that information to the jury. Melton also argues that trial counsel was not made aware of the plea agreement between the State and Tony Houston, who testified against Melton at the Saylor trial, and the fact that Houston testified in exchange for a reduced sentence. Melton concludes that the jury never knew of this motive to possibly lie about Melton's involvement in Saylor's murder.
In denying these Brady claims in the instant case, the trial court noted that the record from the Saylor trial clearly refutes Melton's claims that the State withheld a plea agreement between the State and Houston and allowed Houston to lie about it. In fact, the transcripts demonstrate not only that Terrell was in possession of Houston's plea document, but that he cross-examined Houston extensively about it and read the entire document aloud to the jury. The court also denied *1008 the claim that material evidence was withheld regarding the State's dealings with Lewis in the Saylor case, since Melton's trial counsel was also aware that there had been discussions between the State and Lewis and that although Lewis had no fixed deal, he did maintain an expectation of a benefit in exchange for his testimony against Melton. Furthermore, Terrell questioned Lewis's counsel on direct examination at the penalty phase in the Carter case regarding Lewis's relationship with the State and any plea deal he might be receiving. The trial court denied the claims regarding the statements Lewis made to other inmates in conjunction with its discussion regarding the lack of evidence of claimed ineffective assistance of counsel for discovering that these witnesses or statements existed.
We conclude that error has not been demonstrated in the trial court's denial of this claim or in the reasoning of the trial court set out above. Further, we note that Melton raised this identical Brady argument in his postconviction appeal for the Saylor murder, and we have already noted that the First District recently approved the trial court's denial of all claims of relief for that crime. See Melton, 909 So.2d at 865.
Regarding the alleged Giglio violations pertaining to false or misleading testimony advanced by the State, Melton points to different statements made during the State's closing argument at the Carter trial concerning Lewis's testimony during the guilt phase. A claim under Giglio alleges that a prosecutor knowingly presented false testimony against the defendant; a Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So.2d 1045, 1049 (Fla. 2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. Id. at 1051. Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id. at 1052; see also Mordenti, 894 So.2d at 175.[8]
Giglio claims present mixed questions of law and fact. Sochor v. State, 883 So.2d 766, 785 (Fla.2004). We thus defer to those factual findings supported by competent, substantial evidence, but we review de novo the application of the law to the facts. Id.
Melton asserts that the following argument misrepresented the degree of coercion the State exerted on Lewis to testify at the trial:
MR. SCHILLER: Thank you, Judge. Mr. Lewis was subpoenaed here yesterday. In other words, he didn't come voluntarily to the proceedings. You can see he was in custody anyway, but he was subpoenaed here. And under the law, if the State Attorney's Office, of course, that being Mr. Spencer and I in this case, subpoena a witness so he's compelled to give testimony under oath about the criminal conduct of his  his statement given at the time has what we'd call use immunity, that statement cannot be used against him. And the defense raised this issue yesterday and I want to be sure it's clear, Ben Lewis does not have immunity for this crime. He's under prosecution. The actual things he said yesterday cannot be used *1009 against him is all in that statement and he's here under subpoena.
(Emphasis added by Melton.) Melton also points to the following argument as constituting a clearly false statement, again from the State's closing: "Also as shown there's no deals for Mr. Lewis. Mr. Spencer very carefully developed the evidence and showed y'all that there's been no promises made to Lewis, there's no special deals, no plea negotiations with him. He stands on his own in this case." (Emphasis added by Melton.)
In dismissing this claim, the trial court found that to the extent it was asserting improper argument by the State, it was procedurally barred and should have instead been raised on direct appeal. We agree. See Knight v. State, 923 So.2d 387, 393 n. 6 (Fla.2005) (rejecting a claim regarding improper prosecutorial comments made during closing arguments as procedurally barred in a postconviction motion for failure to raise on direct appeal); Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla. 1995) (stating that issues that could have been but were not raised on direct appeal or issues that were raised and rejected on direct appeal are not cognizable through collateral attack).
Furthermore, aside from the procedural bar, we find these claims to be without merit. The record from Melton's original trial in the instant case indicates that the following exchange took place between Ben Lewis and the prosecutor when he was called to testify by the State:
Q. [by the State] Mr. Lewis, have you been indicted by the grand jury for the murder of George Carter and robbery of George Carter:
A. Yes.
Q. On January 23rd of '91?
A. Yes, sir.
Q. Are those charges currently pending?
A. Yes, sir.
Q. Have any promises been made by the State Attorneys' Office, law enforcement or anyone concerning the disposition of your charges if you testify here today?
A. No, sir.
Q. No promises?
A. No, sir.
Q. Any threats been made to you?
A. No.
Q. Are you represented by counsel? Are you represented by a lawyer?
A. Yes.
Q. Does your lawyer know you're testifying here today?
A. Yes, sir.
Q. What's your lawyer told you to do?
A. Just tell the truth.
Q. Do you realize that  Has your lawyer explained to you that you're here under subpoena today?
A. Yes.
Q. Can what you say here today can be used against you in the trial of your case?
A. Can it be used against me?
Q. Can what you say here today be used in the trial against you in your case?
A. I don't know. I believe it can.
Q. You're here under subpoena?
A. Yes, sir.
On cross-examination, the trial records show that the following exchange took place regarding Lewis's arrangements with the State Attorney's Office:
Q. [by defense counsel] Mr. Lewis, you told Mr. Spencer [prosecutor] that you thought what you testified to *1010 today could be used against you, didn't you?
A. Yes, sir.
Q. Okay. And you're under subpoena here today, aren't you?
A. Yes.
Q. And when you're under subpoena by the State of Florida that means you get immunity, doesn't it?
A. I guess. I don't know.
Q. You don't know. Are you telling this jury you don't know what immunity is?
A. Yeah, I know what immunity is.
Q. And you've been subpoenaed here today?
A. Yes.
Q. [The prosecuting attorney is] listening to everything you're saying this morning, isn't he?
A. Yes, he is.
Q. And if you say something that hurts his case you don't think that's going to make [the prosecuting attorney] very happy, do you?
A. I'm just up here to tell the truth.
Q. What do you think, if you say something that hurts his case that's not going to make him happy, is it? You know that. Is that right?
A. Yeah.
Q. That could make him unhappy, couldn't it?
A. Yes, it could.
Q. And that could deny you a deal in the future, couldn't it, right?
A. I guess so, yeah.
Q. Okay. So you don't have a deal but I bet you're hoping for a deal, aren't you?
A. I'm hoping for something.
Q. You're hoping for probation, aren't you?
A. Uh-huh.
Q. You've been in jail ever since you were picked up on January 23rd, haven't you?
A. Yes.
Q. You're ready to get out of jail now, aren't you?
A. I'm ready to get my time served with.
Thus, his own testimony reveals that Lewis was subpoenaed by the State to testify, that he had obtained use immunity, and that he was currently under indictment for the Carter murder. While the State arguably downplayed Lewis's relationship with the State in its closing argument, the testimony makes clear that there was no formal plea agreement between the two parties. While Lewis may have had great expectations based upon his cooperation with the State, he testified only that he hoped to obtain a deal at some point in the future. Accordingly, on this record we conclude that relief was properly denied under Giglio, since the prosecutorial comments referenced by Melton only reiterate Lewis's own testimony given during the direct and cross-examination at trial.

III. Newly Discovered Evidence
Melton's next argument as to trial court error concerns the discovery of new evidence based in large part on the testimony of the former Escambia County inmates who either implicated Lewis in the Saylor murder or gave a different version of events in the Carter murder. Regarding the testimony of both Sinkfield and Harris in relation to Lewis's role in the Carter murder, Melton argued below that their testimony would have given trial counsel something to present to the jury that would have reduced his culpability. Melton also claimed that the inmate testimony given at the evidentiary hearing below exculpates him in the Saylor murder, thus *1011 neutralizing or rebutting the prior violent felony used as an aggravator in sentencing him to death for the instant crime. Melton also argued that statements made in Lewis's postsentence investigation report constitute newly discovered evidence that warrants a new trial.
To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the party or counsel at the time of trial, and the defendant or defense counsel seemingly could not have known of it by the use of diligence. See Jones v. State, 709 So.2d 512, 521 (Fla.1998) (Jones II). Second, the newly discovered evidence must be of such a type that it would probably produce an acquittal on retrial. Id. Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. See Jones v. State, 591 So.2d 911, 915 (Fla.1991) (Jones I).
In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones II, 709 So.2d at 521 (citations omitted).
When the trial court rules on a newly discovered evidence claim after an evidentiary hearing, we review the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence. Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). As with rulings on other postconviction claims, we review the trial court's application of the law to the facts de novo. See Hendrix v. State, 908 So.2d 412, 423 (Fla.2005) (reviewing de novo the trial court's application of the law to the facts in ruling on a postconviction claim that the government withheld material evidence); Gore v. State, 846 So.2d 461, 468 (Fla.2003) (reviewing de novo the application of the law to the facts on a claim of ineffective assistance of trial counsel).
The trial court below denied this claim, finding that this newly discovered evidence did not meet the stringent Jones standard to afford Melton relief. The trial court initially concluded that a jury would not have found these newly found witnesses credible since Melton himself testified that he was the shooter. Furthermore, the trial court, citing to Melendez v. State, 718 So.2d 746 (Fla.1998),[9] questioned the overall *1012 credibility of these witnesses and noted that their versions of events were not even consistent with one another.[10]
Regarding Melton's claim that this evidence could be used to exculpate him in the Saylor murder and could therefore rebut one of the aggravators used in sentencing him to death in the instant crime, we also note, again, that Melton raised this same newly discovered evidence claim, based on the same inmate testimony, as a part of his rule 3.850 motion challenging his conviction in the Saylor murder, which the trial court denied. As discussed in the preceding issues, this denial has recently been affirmed by the First District and is not subject to review in these proceedings.
Melton also argues that this evidence establishes that he was not the triggerman in the Carter murder. However, a review of Melton's testimony during his guilt phase makes clear that he admitted to being the shooter. Melton testified that there was a "big struggle" between him and Carter in the pawn shop during the robbery, that Melton was holding a gun during this struggle, and that it discharged and Carter fell over. Certainly, during his direct examination, Melton disputed Lewis's version of events,[11] including Lewis's testimony that it was Melton's idea to rob the store and that there was no scuffle between Melton and Carter that led to the gunfire. However, on cross-examination, the State made a couple of references to Melton actually being the triggerman, such as "the gun you later shot him with in the head," and "after you shot Carter in the head," which Melton did not deny or contradict.
As this Court held in Kokal v. State, 901 So.2d 766 (Fla.), cert. denied, ___ U.S. ___, 126 S.Ct. 560, 163 L.Ed.2d 471 (2005), "In reviewing a claim of newly discovered evidence, a trial court is required to `consider all newly discovered evidence which would be admissible' at trial and then evaluate the `weight of both the newly discovered evidence and the evidence which was introduced at the trial.'" Id. at 775 (quoting Jones II, 709 So.2d at 521). Melton argues that the testimony of Harris and Sinkfield could have reduced Melton's culpability in the eyes of the jury; however, Melton had already testified to that jury that he was the triggerman. Thus, his role in the crime was already established.
The newly discovered evidence, if admissible at all, would have only presented yet two more accounts of the incident; while they are supposedly Lewis's accounts of the crime, they both contradict not only how Lewis himself testified that the crime occurred, but they also contradict each other. Furthermore, as the two witnesses have approximately thirty-two other felony convictions between them, we find no error in the trial court's conclusions as to their lack of credibility. Finally, as the State argues, Lewis neither recanted his testimony nor testified at the evidentiary hearing regarding any of these discrepancies. Accordingly, we find no abuse of discretion in the trial court's conclusion that this newly discovered evidence is insufficient to afford Melton relief. See id. at 776 (concluding *1013 that the defendant failed to meet the second prong of the newly discovered evidence test because the new "testimony contradicts other evidence presented at trial, most notably the testimony of [the defendant] himself").
Melton also asserted below that Lewis's postsentence investigation report constitutes newly discovered evidence; specifically, Melton emphasizes the following statement as corroborative of his version of events in the Carter murder and inconsistent with the testimony Lewis gave at trial:
After Mr. Carter opened the safe he apparently began struggling with Melton. Melton and Lewis then struck the victim, knocking him to the floor. Lewis was placing cash and jewelry in a bag when Melton fired his weapon, striking Mr. Carter in his head, the bullet exiting under his chin.
The trial court dismissed this argument, finding the report to be both inadmissible and hearsay. Although the specific portion of the report emphasized by Melton appears to contradict Lewis's trial testimony, the excerpt nevertheless further establishes that Melton, not Lewis, was the triggerman in the Carter homicide. Thus, this newly discovered evidence could not have produced an acquittal under the requirements set forth in Jones II, which held that the newly discovered evidence must be of such a nature that it would probably produce an acquittal upon retrial. 709 So.2d at 521. Thus, we agree that relief was not warranted on this claim.

IV. Prosecutorial Misconduct
Melton's next argument concerns statements made by the prosecutor during closing arguments; specifically, Melton claims that on more than one occasion, the State fostered sympathy for the victim and made an impermissible "golden rule" argument when he described Carter's death. Melton points to other prosecutorial comments as being speculative, as mischaracterizing witness testimony, and as attempting to bolster the medical examiner's testimony. Finally, he argues that the cumulative effect of these comments was to improperly appeal to the jury's passions and prejudices. We agree with the trial court's dismissal of this claim as procedurally barred. See Knight, 923 So.2d at 393 (rejecting a claim regarding improper prosecutorial comments made during closing arguments as procedurally barred for failure to be raised on direct appeal).
Furthermore, on the merits of this claim, Melton points to nothing so egregious as to warrant relief. For example, while Melton argues that the prosecutor made an improper "golden rule" argument, in fact the prosecutor (as referenced by Melton) only mentioned the fact that Carter pleaded for his life before Melton shot him. As to the "bolstering" claim regarding the medical examiner, Melton only references an argument in which the State highlighted the expert's qualifications, noting that he had expert forensic training and that it was his duty to perform autopsies and present opinions on them. Accordingly, the trial court properly denied this claim for relief.

V. The Jury
Melton next argues that he was tried by a petit jury which was not a fair cross-section of the community, and further that there was an unconstitutional systematic exclusion of a significant portion of the nonwhite population from the jury pool. Specifically, Melton argues that during jury selection, the prosecutor sought to individually voir dire five of the six African-American women on the petit jury. The State then struck two of the jurors over defense objections. Melton asserts that, in reviewing the prosecutor's trial *1014 notes, it is clear that he singled out the African-American jurors. Furthermore, since there is no record of the racial composition of Melton's jury, an evidentiary hearing is necessary for Melton to fully develop this argument. The trial court summarily dismissed this claim as being procedurally barred.
We agree with the trial court's dismissal of this claim. Claims alleging that a defendant's jury was not a fair cross-section of the community should be raised on direct appeal. See Reaves v. State, 826 So.2d 932, 936 n. 3 (Fla.2002) (concluding that a claim regarding whether the jury was a fair cross-section of the community is procedurally barred because it either was or could have been raised on direct appeal).
Aside from the procedural bar, we find that this claim also fails on the merits. Melton names five potential jurors who were individually voir dired during jury selection: Rosetta King, Lila May Hopkins, Willie Williams, Emma Campbell, and Doris Stanley. The trial records show that the State challenged Ms. King for cause because she acknowledged that she did not think the death penalty was appropriate in any circumstance, and also because she knew the defendant's family. The court granted this challenge for cause. The State objected to Lila Hopkins for cause for basically the same reasons, that she knew the family very well and it would be difficult for her to serve on the jury or impose the death penalty. The court also granted this challenge for cause. The State challenged Willie Williams because a close cousin had been prosecuted by the State Attorney's Office for drug offenses. In making this challenge, the prosecutor wanted the record to reflect that he was aware this potential juror was an African-American but that he had legitimate reasons for challenging her. Ultimately, however, after questioning her, the State withdrew its challenge. The State challenged Emma Campbell because she indicated she was on medication and that it would be a hardship on her health to sit through the trial. The defense made no objection to her being excused. The State objected to Doris Stanley for cause because she stated that she could not recommend the death penalty. The court granted the State's challenge for cause.
Accordingly, in reviewing the record, three of the potential jurors referenced by Melton were excused for a legitimate cause: they all individually expressed that they would be unable to impose the death penalty in any circumstance. See Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'") (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). Of the other two potential jurors, the State withdrew its challenge to one and both sides supported excusing the other. Thus, we do not agree that the record demonstrates that there was the systematic exclusion of a significant portion of the non-white jury pool, as Melton argues. Relief on this claim was properly denied.

VI. Melton's "Lack of Remorse"
The final claim Melton asserts on appeal is that in referencing Melton's "lack of remorse" in its order denying postconviction relief, the lower court improperly considered a nonstatutory aggravating factor. Melton cites to numerous opinions from this Court holding that lack of remorse is a nonstatutory aggravating circumstance and cannot be considered in a *1015 capital sentencing. Thus, Melton claims that he was denied the right to a fair hearing and that he is therefore entitled to a new hearing before an impartial tribunal. We conclude that Melton is not entitled to relief on this claim since the court below was not sentencing the defendant, nor was it considering aggravating circumstances in considering the postconviction claims. Furthermore, the court only made a passing reference to Melton's lack of remorse, which has been found to constitute no error by this Court in previous cases.
The relevant portion of the trial court's order denying relief concerns the court's discussion of the mitigation presented by counsel at Melton's original trial:
This court finds that, in essence, this information was presented to the jury during the penalty phase and to the trial court who ultimately decided that the death penalty was appropriate. In the penalty phase, the Defendant steadfastly denied his involvement in the Saylor murder. It is this Court's belief that the steadfast denial of his involvement in the Saylor murder may have been one of the strongest condemning factors against him during the penalty phase. The complete denial of culpability must, of necessity, reflect a complete lack of remorse regarding the death of Ricky Saylor. The judge and the jury had before it the overwhelming aggravating factor of the Defendant's murder of another human being prior to the murder of Mr. Carter. Defense counsel was at an overwhelming disadvantage and this Court finds that he presented the best evidence and argument that could be made for the benefit of the Defendant.
Melton relies on the following four cases to establish that his lack of remorse cannot be considered in his capital sentencing: Shellito v. State, 701 So.2d 837 (Fla.1997); Colina v. State, 570 So.2d 929 (Fla.1990); Trawick v. State, 473 So.2d 1235 (Fla. 1985); and Pope v. State, 441 So.2d 1073 (Fla.1983). Melton is correct that these cases stand for the proposition asserted; however, this Court makes clear, in Shellito for example, that "lack of remorse is a nonstatutory aggravating circumstance and cannot be considered in a capital sentencing." 701 So.2d at 842 (emphasis added).
Initially we note that Melton is contesting comments made by a trial court in dismissing his claims for postconviction relief; these comments were not a part of his sentencing. Thus, these holdings do not govern the instant case. Furthermore, in Shellito, we went on to note that, on the record in that case, "the brief reference to lack of remorse was of minor consequence and constituted harmless error." Id. In this case, the trial court only included two sentences in its postconviction order regarding Melton's lack of remorse in a detailed and lengthy discussion regarding the presentation of mitigation and the weight of the aggravators considered by the jury during his penalty phase. Accordingly, such comments constitute harmless error. We do not find that Melton was denied his right to an impartial postconviction hearing.

PETITION FOR WRIT OF HABEAS CORPUS
Melton includes five arguments in his petition for writ of habeas corpus, three of which allege that appellate counsel was ineffective for failing to raise the following claims during his direct appeal: (1) that the State engaged in prosecutorial misconduct when it introduced testimony regarding Melton's prior murder conviction as an aggravating factor; (2) that the prosecutorial misconduct renders Melton's death sentence fundamentally unfair and unreliable; and (3) that the jury was improperly *1016 instructed on the pecuniary gain aggravator. Melton also argues (4) that Florida's capital sentencing scheme is unconstitutional in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (5) that Melton's conviction violates Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

I. Melton's Prior Murder Conviction as an Aggravator
Melton asserts that appellate counsel was ineffective for failing to challenge the use of his prior murder conviction as an aggravator in his initial appeal. Specifically, Melton takes issue with Schiller's testimony, over defense objection, that there was no evidence whatsoever that anyone other than Melton was the triggerman in the Saylor murder. Melton points to other statements that were irrelevant, misleading, highly prejudicial and that introduced evidence that had not been heard by either jury. Melton also asserts that most of Schiller's testimony could only have been rebutted by Melton had he testified in the prior trial, or was speculative and could not have been rebutted at all, and thus violates Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
In Rhodes v. State, 547 So.2d 1201 (Fla. 1989), this Court enunciated the principles governing the admission of prior violent felonies in criminal phase proceedings:
[I]t is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction. Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence. . . .
. . . .
. . . [T]he line must be drawn when that testimony is not relevant, gives rise to a violation of a defendant's confrontation rights, or the prejudicial value outweighs the probative value.
Id. at 1204-05 (citations omitted). In Dufour v. State, 905 So.2d 42 (Fla.2005), this Court held that it is proper for a prosecutor who previously prosecuted a defendant to give testimony regarding the defendant's prior crime. Id. at 63 ("Moreover, the trial court did not err in allowing [the former prosecutor] to provide testimony regarding details of the [previous] murder.").
We find that Melton has not raised a valid claim for relief since appellate counsel was not ineffective for failing to raise this issue on appeal. We find nothing inappropriate in Schiller's testimony regarding Melton's prior conviction. Moreover, the transcripts make clear that the bulk of Schiller's time on the stand was spent being examined by defense counsel in an attempt to cast doubt on Melton's conviction for the Saylor murder.
The transcripts from Melton's trial reveal that the State called Schiller to the stand during the penalty phase on direct examination, at which point he only stated that he prosecuted Melton in the Saylor murder and then introduced a copy of the certified conviction. However, once Terrell took over on cross-examination, he questioned Schiller in depth regarding the entirety of Melton's trial and conviction for Saylor's death. Initially, he questioned Schiller about sentencing guidelines, concurrent sentencing, and gain time. Terrell then asked Schiller about a jury question that arose at the Saylor trial; Schiller confirmed that the question indicated that the jury was struggling with whether to *1017 convict Melton as a principal in the Saylor crime.[12]
Regarding Schiller's testimony concerning the evidence against Melton in the Saylor crime, the record also demonstrates that Terrell objected when the State asked Schiller, on redirect, whether "there [was] any evidence received whatsoever that anyone other than Melton, the defendant in this case, was the triggerman [in the Saylor murder]?" Conferencing at the bench, Terrell argued that the State was attempting to impeach the verdict and that it was a comment on the defendant's right to remain silent, since Melton did not testify at the Saylor trial pursuant to counsel's advice. The court disagreed and allowed the question, which Schiller answered in the negative.[13]
In addition to this objection, trial counsel clearly used Schiller's time on the stand to attack the evidence against Melton in the Saylor trial. For example, Terrell asked Schiller about statements Ben Lewis made while in prison regarding this crime and asked Schiller to detail how Lewis was brought into the State Attorney's Office, granted immunity, and that he was never indicted in the Saylor case. Terrell also elicited testimony from Schiller regarding various lies Lewis made while under oath and conflicting statements he gave concerning details of the Saylor crime. Terrell clarified that it was Lewis who implicated everyone in the Saylor murder; he further introduced evidence of Tony Huston's plea agreement, which reduced his charges in the Saylor case to armed robbery and second degree murder with a recommended sentence of ten to twenty-five years.[14] Defense counsel also asked Schiller about other witness testimony that differed as to the number of people in the cab during the Saylor murder and how Lewis solicited false testimony to corroborate his version of events.
In addition, Melton is correct in asserting that Schiller detailed the Saylor crime for the Carter jury. While being questioned by defense counsel, Schiller gave a detailed (two pages of testimony) account of the events leading up to and surrounding the Saylor crime. However, as is authorized under Rhodes, Schiller merely described the general events surrounding the Saylor crime, including that the victim was shot once in the head at close range. We find nothing in his version of events to be inflammatory or prejudicial. Schiller only recounted, based on Ben Lewis's version of events, the parties involved, how they formulated the plan to rob the taxi, and then how the crime supposedly occurred. He also testified as to the evidence in the case. In addition, Terrell confirmed with Schiller that, at the Saylor trial, Melton's counsel argued to the jury that the whole story had been made up by Lewis and Houston. Terrell also clarified that every time Lewis testified regarding Saylor's case, he had immunity. He also pointed out that there *1018 was some evidence indicating that Lewis was involved in the crime to a greater extent than he acknowledged.
We conclude that appellate counsel was not ineffective for failing to raise this claim on appeal since the prior violent felony was appropriately introduced as an aggravator. See Pietri v. State, 885 So.2d 245, 273 (Fla.2004) (holding that appellate counsel cannot be found to be ineffective for failing to raise a meritless claim). Ultimately, the majority of Schiller's time on the stand was spent being examined by defense counsel regarding the role of Ben Lewis, his and Huston's relationship with the State Attorney's Office in prosecuting Melton for Saylor's murder, the inconsistencies in other accounts of the crime, and other such evidence that seemed to be an attempt on behalf of defense counsel to cast doubt on Melton's guilt in Saylor's death. Accordingly, we find that Melton's claim of ineffectiveness of appellate counsel is without merit. Schiller's testimony is not prejudicial to the point of outweighing its probative value.
Finally, as to Melton's argument that his rights under Crawford were violated, this claim is likewise without merit. This Court has recently held that Crawford does not apply retroactively. See Chandler v. Crosby, 916 So.2d 728, 729 (Fla. 2005), cert. denied, ___ U.S. ___, 127 S.Ct. 382, 166 L.Ed.2d 275 (2006). As Melton's conviction became final in October of 1994, ten years prior to Crawford, relief is denied.

II. Prosecutorial Misconduct
Melton's next argument concerns the same conduct complained of in his rule 3.850 motion, this time alleging that appellate counsel was ineffective for failing to challenge these comments as a part of his direct appeal. The State correctly counters that appellate counsel was not ineffective for not pursuing these claims, first because appellate counsel actually raised three preserved prosecutorial-misconduct complaints in Melton's direct appeal,[15] and *1019 also because appellate counsel cannot be found to be ineffective for failing to present unpreserved errors. See Johnson v. Singletary, 695 So.2d 263, 266 (Fla.1996) (observing appellate counsel cannot be ineffective for failing to raise claims which were not preserved due to trial counsel's failure to object). We conclude that none of the unpreserved prosecutorial conduct cited here appears to constitute the fundamental error necessary to overcome the lack of preservation by trial counsel. See Farina v. State, 937 So.2d 612, 631 (Fla. 2006) ("[I]n order to decide whether appellate counsel rendered ineffective assistance for failing to raise a claim of prosecutorial misconduct, [the court] must determine whether the alleged misconduct (which was not preserved) was fundamental error. . . .").[16] Accordingly, relief is denied on this claim.

III. Pecuniary Gain Aggravator
Melton next asserts ineffective assistance of appellate counsel for failing to argue that the jury instruction regarding pecuniary gain did not give the jury meaningful guidance as to what was necessary to find the aggravating factor present in violation of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Furthermore, Melton argues that the evidence presented does not support a finding of this aggravating circumstance since the evidence failed to show that the murder was an integral step in obtaining Carter's possessions. As a result, Melton argues that his jury relied upon an improper aggravating factor in arriving at its recommendation of death.
This Court addressed the applicability of the pecuniary gain aggravator on Melton's direct appeal:
Third, Melton argues that the trial court erred in instructing the jury on and later finding the aggravating circumstance that the homicide was committed for pecuniary gain. In sentencing Melton, the trial judge found the evidence supported the aggravating factors that (1) the murder occurred in an attempt to complete the crime of robbery and to steal the victim's property of substantial value and (2) the felony murder was committed while the defendant was engaged in the commission of a robbery. He noted that the facts supporting these two circumstances are the *1020 same and cannot be used to find two aggravating circumstances. The judge chose to find that the evidence established beyond a reasonable doubt that the felony murder was committed for financial gain. The record supports this finding.[N. 5] This Court has held that finding pecuniary gain in aggravation is not error when felonies including robbery have occurred. Bates v. State, 465 So.2d 490, 492 (Fla.1985). Thus, we deny relief on this issue.
[N. 5] Testimony supporting this finding includes Melton's testimony that he carried a gun when he went to the pawn shop to steal some rings and he held a gun on Carter while Lewis gathered up proceeds from the robbery. After Melton shot Carter, he did not throw down the gun, but put the gun back into his waistband.
Melton, 638 So.2d at 930. Thus, this Court has already upheld the applicability of the pecuniary gain aggravator in Melton's conviction.

IV. Relief Pursuant to Ring

Both the Florida Supreme Court and the United States Supreme Court have held that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not apply retroactively. See Johnson v. State, 904 So.2d 400, 402 (Fla. 2005); Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Melton's death sentence became final when this Court denied his Motion for Rehearing after rejecting his direct appeal, in July of 1994. This was nearly eight years before Ring was decided in 2002; therefore, Melton cannot rely on Ring to find his death sentence unconstitutional. See Washington v. State, 907 So.2d 512, 514 (Fla.2005) (finding defendant not entitled to relief under Ring because Ring is not applied retroactively).

V. Relief Pursuant to Roper

Melton's final argument contends that Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), stands for the proposition that the Eighth Amendment precludes reliance upon criminal acts committed before the age of eighteen from serving as a basis for the imposition of the death penalty. This Court recently addressed this question in England v. State, 940 So.2d 389 (Fla.2006), which likewise involved the application of aggravators based upon felony convictions that occurred before the defendant was eighteen years of age. In that decision, this Court unanimously held as follows:
England argues that because the trial judge based two aggravating factors on felony convictions for crimes that occurred before England was eighteen years of age, Roper prohibits the imposition of the death penalty. In Roper, the United States Supreme Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Roper, 543 U.S. at 578, 125 S.Ct. 1183. The Court provided a bright line rule for the imposition of the death penalty itself, but nowhere did the Supreme Court extend this rule to prohibit the use of prior felonies committed when the defendant was a minor as an aggravating circumstance during the penalty phase. This claim has no merit.
Id. at 406-07. Therefore, Melton is denied relief on this final claim.

CONCLUSION
For the reasons stated, we affirm the circuit court's denial of postconviction relief and deny Melton's petition for a writ of habeas corpus.
It is so ordered.
*1021 LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Huff v. State, 622 So.2d 982 (Fla.1993).
[2] Melton concedes that, because the First District recently affirmed the denial of postconviction relief in the Saylor murder, he is not entitled to relief on his claim that an invalid prior conviction was improperly introduced into evidence during his penalty phase. See Melton v. State, 909 So.2d 865 (Fla. 1st DCA 2005).
[3] Melton cites to State v. Mills, 788 So.2d 249 (Fla.2001), for the proposition that a codefendant's prior inconsistent statements can be admissible for impeachment purposes. In that case, this Court upheld a trial court's decision to grant a new sentencing in a capital case on the basis of the defendant's postconviction newly discovered evidence claim, which concerned statements his codefendant made to a third party, Anderson, indicating that Mills was not the triggerman. Id. at 250. In agreeing that the evidence could be admissible as newly discovered evidence, this Court noted that "[t]he evidence presented by Anderson was unknown at the time of trial and neither Mills nor his counsel could have discovered it with due diligence; the evidence would have been admissible at trial, if only for impeachment; and the newly discovered evidence, when considered in conjunction with the evidence at Mills' trial and 3.850 proceedings, would have probably produced a different result at sentencing." Id.

These cases can be distinguished. In the instant case, Melton is arguing ineffective assistance of trial counsel for failing to produce Harris and Sinkfield; Mills, however, involved only newly discovered evidence and not the Strickland performance/prejudice inquiry, which this Court has since applied to claims regarding uncalled witnesses in Nelson v. State, 875 So.2d 579, 583-84 (Fla.2004).
[4] Melton's claim that trial counsel was ineffective for failing to adequately investigate the true nature and extent of Lewis's negotiations with the State is discussed as part of our denial of his petition for writ of habeas corpus.
[5] These inmates are David Sumler, Paul Sinkfield, Lance Byrd, Alfonso McCary, Bruce Crutchfield, and Fred Harris. As noted previously, although all discussed the Saylor case, Sinkfield and Harris also gave testimony regarding Lewis's statements to them about the Carter murder.
[6] Prosecutor Joseph Schiller's testimony in the penalty phase, including his cross-examination by Terrell, is discussed in more detail as part of Issue I in the accompanying petition for writ of habeas corpus, in which Melton argues that appellate counsel was ineffective for failing to argue that the State engaged in prosecutorial misconduct when it introduced testimony regarding Melton's prior murder conviction as an aggravating factor.
[7] Melton emphasizes that in his notes from his interview with Sumler, Officer O'Neal wrote down that Lewis told Sumler that his "partner" had shot the cab driver and that Lewis admitted to being there. However, in O'Neal's notes, the word "Melton" was scratched out from the notes and replaced by "partner." Melton asserts that the gist of Sumler's statements, basically indicating that Lewis admitted to Sumler that Melton was not involved in the Saylor murder, were withheld from Melton's trial counsel. Melton also emphasizes the confusion caused by the misuse of "Summerlin" instead of "Sumler," arguing that the State never made Melton's trial counsel aware of the mistake. Terrell acknowledged at the evidentiary hearing that he was never informed that others were saying that Melton did not shoot the cab driver.
[8] Thus, the standard applied under the third prong of the Giglio test is more defense friendly than the test set out in Strickler, which is applied to a violation under Brady.
[9] In Melendez, this Court supported a trial court's dismissal of a newly discovered evidence claim based on the new testimony of five individuals. 718 So.2d at 748. In that case, the trial court found:

[T]he newly discovered evidence claim rests on the testimony of three convicted felons . . ., the partial recanting of a co-defendant's testimony, and a lawyer's vague memories of Vernon James' several confessions. The original defense was that Vernon James did it. The jury rejected that defense and none of the above would likely have been credible enough to change that verdict in my opinion.
Id.
[10] The discussion of the inmate witnesses' credibility was included in the trial court's dismissal of Melton's rule 3.850 motion on the Saylor conviction.
[11] Lewis's own testimony regarding his version of events disputes that there was a fight or scuffle between Melton and Carter and states that Melton shot Carter when Lewis was attempting to unlock a side door so they could escape.
[12] The jury question requested clarification on the charge of robbery with a firearm. The specific question reads as follows: "Does it mean the defendant had the gun during the robbery and fired it or if someone else could have used the gun? Does it and/or mean we can choose simply felony? Was a weapon found?"
[13] Melton previously challenged this same comment in his direct appeal and we denied relief, stating, "The question concerns the evidence as a whole in the prior case and not Melton's failure to testify." Melton, 638 So.2d at 930. Accordingly, any argument as to the propriety of this question is procedurally barred. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) (stating that issues that were raised and rejected on direct appeal are not cognizable through collateral attack).
[14] Houston was sentenced to twenty years in prison and five years of probation for the Saylor crime.
[15] The pertinent section from this Court's opinion in Melton's direct appeal reads as follows:

Melton argues that the State made an improper comment on his right to remain silent when it asked the attorney who prosecuted him for the prior murder and robbery this question: "[W]as there any evidence received whatsoever that anyone other than Antonio Lebaron Melton, the defendant in this case, was the triggerman [in the prior case]?"
Melton, acting on counsel's advice, did not testify in the earlier trial. The judge in the instant case overruled defense counsel's objection. While a prosecutor cannot make any comment before a jury that is fairly susceptible of being interpreted as a comment on a defendant's right to remain silent, the prosecutor's question concerns a case for which Melton had already been convicted. Melton does not argue that any comment in the instant case could be construed as commenting on his right to remain silent. Even if the inquiry about the previous case is relevant, it is not a comment on Melton's right to remain silent. A prosecutor can review the evidence as a whole and point out that it is uncontradicted. See, e.g., White v. State, 377 So.2d 1149, 1150 (Fla.1979). The question concerns the evidence as a whole in the prior case and not Melton's failure to testify.
Melton also objected to a prosecutor's comment that he claimed extracted a commitment from the jury to recommend a death sentence. We do not interpret the comment in that way. Instead, during his closing argument in the penalty phase, the prosecutor asked jurors to recall the answers they gave to questions during voir dire. The record shows that the prosecutor did not seek a commitment during voir dire.
In addition, Melton asked for a mistrial when the prosecutor told jurors during the penalty phase that they should not consider disparate treatment of codefendants in their sentencing recommendation. The trial judge denied the motion for a mistrial, but told jurors they could consider a codefendant's sentence. Later, when the judge instructed the jury in the penalty phase, he pointed out that jurors could consider in mitigation "any other aspect of the defendant's character or record and any other circumstances of the offense." None of the prosecutor's comments merit relief.
Melton, 638 So.2d at 929-30 (footnote omitted).
[16] While Melton does raise one issue of prosecutorial misconduct which this Court has previously recognized, the error is not egregious enough to warrant relief. In the prosecutor's penalty phase closing argument, Melton takes issue with the following comments: (1) that the jurors must "fulfill [their] duties by recommending to this Court the appropriate punishment for this murder, that Antonio Lebaron Melton be sentenced to die;" and (2) that "the only proper recommendation to this court is a recommendation of death." These prosecutorial comments, telling the jurors that it is their duty to recommend the death penalty, were improper. See Orme v. State, 896 So.2d 725, 739 (Fla.2005) (finding that prosecutorial comments in a capital sentencing phase were not error because they "did not encourage jurors to `do their duty' for the community or `send a message' through their sentencing decision").

However, we do not agree that these two isolated comments are significant enough to taint the entirety of Melton's verdict and require relief. See Peterka v. State, 890 So.2d 219, 243 (Fla.2004) ("Fundamental error is error that reaches `down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'") (quoting Spencer v. State, 842 So.2d 52, 74 (Fla. 2003)).