701 So.2d 837 (1997)
Michael SHELLITO, Appellant,
v.
STATE of Florida, Appellee.
No. 86931.
Supreme Court of Florida.
September 11, 1997.
Rehearing Denied November 26, 1997.
*838 Nancy A. Daniels, Public Defender and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Attorney General and Curtis M. French, Assistant Attorney General, Tallahassee, for appellee.
PER CURIAM.
We have on appeal Michael Shellito's conviction and sentence of death for first-degree murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm both the conviction and the sentence.
The State presented the following evidence at trial. On the evening of August 30, 1994, Shellito and a number of other individuals were staying at Stephen Gill's apartment. Shellito left the apartment around midnight on August 30 and returned approximately an hour later. When he returned, he showed Ricky Bays a gun that he said he "got from a van" that night. Kevin Keyes, who lived about six miles from Gill's apartment, had a.9 millimeter gun stolen from his truck sometime after 10 p.m. on that same night.
Around 4 a.m. on August 31, Shellito and Gill took Gill's girlfriend home in Gill's mother's white pickup truck. The girlfriend stated that, a block from her house, Shellito told Gill to let him out because he needed to "talk to someone." Gill let Shellito out and took his girlfriend home. Gill and his girlfriend talked for five minutes and then he left.[1]
About this same time, Michael Green was awakened by a noise in front of his home. When he looked out his window, he saw a white pickup truck in the road; saw the victim standing by the truck; heard a pop; *839 and saw the victim spin around, run, and fall over by Green's gate. By the time Green called 911, the truck was gone.
Police found the body of eighteen-year-old Sean Hathorne by Green's front fence. The cause of death was a gunshot wound to the chest. A shell casing was found near the body.
Shellito and Gill returned to Gill's apartment together around 5:30 a.m. At that time, Shellito told Ricky Bays that he shot someone after they dropped off Gill's girlfriend. He told Bays that he saw a man walking down the street, stopped and shook him down, and, after determining that the man had no money, shot him. Shellito did not say whether Gill was involved, but Gill was present when Shellito related the story to Bays.
On the evening of August 31, a group was again gathered at Gill's apartment. Shellito showed Lateria Copeland and Theresa Ritzer a gun and told them both about the murder, stating that he told the victim he was "out of gas" just before he shot him.
That same night (in the early hours of September 1), police raided the apartment. Shellito jumped out a window and ran but was stopped by a police dog. After Shellito aimed a gun at an officer, officers shot and wounded him. The gun recovered from Shellito was identified as the gun that fired the shell casing found at the murder scene and that was stolen from Kevin Keyes' truck the previous night.
In his defense, Shellito argued that the murder was committed by Gill. Shellito also emphasized that Bays was a convicted felon and had been in jail since the night of the raid on unrelated charges. Shellito also presented one of Bays' cellmates, who stated that Bays had papers with him, including one that looked like a police report, and that Bays made an offer to him to "jump" Shellito's case, i.e., trade information for a more lenient sentence. However, the story related by the cellmate about the murder at issue was totally inconsistent with the facts.
Shellito's mother testified that Gill, whom she had met only once before, came to her house after Shellito was charged with the murder and confessed to her that he had committed the crime. Shellito's father testified that he overheard parts of the conversation between Gill and Shellito's mother and that he heard Gill say he told his attorney that he killed the victim. Although neither reported this story to the police until a week before trial, Mrs. Shellito stated that she thought she told a court employee about her conversation with Gill. On rebuttal, the court employee stated that she had a brief conversation with Mrs. Shellito, but that Mrs. Shellito said nothing about someone else having committed the murder.
Shellito also presented testimony from a witness who lived across the street from the murder site. The witness testified that around 4 a.m. he heard tires screeching as if a vehicle had stopped suddenly, and he looked out a window and saw the shadow of a person moving around the back of a truck. The person appeared to be coming from the driver's side of the vehicle and was not the person who was shot. On cross-examination, the witness admitted that he was not positive about this information and that he did not have on his glasses when he looked out the window.
Shellito was convicted as charged.
At the penalty phase proceeding, the State presented evidence that Bays and Shellito were convicted of two armed robberies they committed on the night of August 31 before the raid, and that Shellito was convicted for aggravated assault on a law enforcement officer (from the night of the raid) and for a March 1994 aggravated assault. Bays testified that Shellito held the gun to the victim's head during both of the robberies. One of the victims related a similar story.
Shellito presented testimony that his father was an alcoholic and was in the Navy and away a lot; that, when Shellito was about two years of age, the State took custody of the children for a month while their mother was in jail; that Shellito stuttered badly as a child, was very loving, and was hit by his father on at least three occasions. Shellito's mother testified that he was emotionally handicapped, had reading and psychological problems, had a learning disability, *840 had organic brain disorder, and had tried to kill himself. A psychologist's report from Shellito's early childhood reflected that he had numerous problems as a child. Other reports showed that he had a low-to-average IQ, was learning disabled and emotionally handicapped, and suffered from organic mental disorder, conduct disorder, and developmental language disorder.
The jury recommended death by an eleven-to-one vote, which the trial judge followed. The judge found two aggravating circumstances (prior violent felony and pecuniary gain/committed during a robbery (merged)). In mitigation, he gave slight weight to Shellito's age and background and character.
Shellito raises three guilt phase issues[2] and six penalty phase issues.[3]

GUILT PHASE
In his first guilt-phase issue, Shellito contends that the trial judge erred in admitting evidence of Shellito's attempt to flee from Gill's apartment during the police raid. He asserts that this evidence was only minimally relevant and included prejudicial collateral crime evidence, the introduction of which warrants a new trial. Although he admits that evidence of flight is generally admissible to allow the fact-finder to infer consciousness of guilt, he claims that the evidence was inadmissible here because it was impossible to say whether the flight resulted from illegal activities taking place inside Gill's apartment or from the homicide.
The law is well settled that evidence of flight is admissible as being relevant to infer consciousness of guilt where sufficient evidence exists to establish that the defendant fled to avoid prosecution of the charged offense. Escobar v. State, 699 So.2d 988 (Fla.1997); Harvey v. State, 529 So.2d 1083 (Fla.1988); Merritt v. State, 523 So.2d 573 (Fla.1988). The fact that a defendant has committed more than one crime within a short period of time does not preclude introduction of the evidence of flight where a sufficient evidentiary nexus exists to permit a jury to reasonably infer consciousness of guilt from the flight. Escobar; Bundy v. State, 471 So.2d 9 (Fla.1985). In Merritt, we concluded that the evidence of flight was erroneously introduced because the flight occurred three years after the crime. Similarly, in Escobar, we concluded that evidence of flight was inadmissible because it occurred in another state twenty-seven days after the murder at issue and the defendant had no reason to believe he was a suspect in the murder at the time of the flight. On the other hand, in Bundy we concluded that the evidence of flight was properly introduced where the flight occurred several days after the victim disappeared. As in this case, Bundy had argued that the evidence was improperly introduced because the State failed to prove that he fled to avoid prosecution for the murder at issue rather than for other crimes. We found that the evidence of flight was properly introduced because a jury could reasonably infer Bundy's consciousness of guilt from the flight given that it occurred only days after the crime at issue had occurred. See Bundy; Merritt, 523 So.2d at 574 (discussing Bundy). See also Straight v. State, 397 So.2d 903 (Fla.1981)(flight and use of deadly force against officer one day after murder and other crimes properly admitted as relevant to consciousness of guilt).
Under the circumstances of this case, we conclude the State presented sufficient evidence to establish that Shellito's flight and *841 use of deadly force against the officer were due to this crime. The flight and use of force occurred within twenty hours of the murder, Shellito had bragged to others in the apartment about the murder shortly before the raid, and the gun in his possession at the time of the flight was identified as the murder weapon. The fact that Shellito committed several robberies during the brief period of time between the murder and the raid does not prevent a jury from hearing evidence regarding his flight and use of force under these facts.
In his second claim, Shellito contends that the trial judge erred in allowing an officer to testify regarding a statement made by Ricky Bays. During the State's case-in-chief, Bays testified that Shellito told him he shot someone. He also testified that, when he was arrested for robbery approximately twenty hours after Shellito made that statement, he told police what Shellito had said. During cross-examination, Bays admitted that at the time he made the statement to police he was concerned about the charges against him; that he kept evidence in his own case under his mattress; and that he read about the murder in this case in the newspapers while he was in jail. To counter statements Bays made on cross-examination and the inference of recent fabrication, the State sought to introduce testimony from an officer regarding the details of Bays' post arrest statement and the fact that no homicide or police reports had been written at the time Bays made his statement. Shellito objected, contending that this testimony constituted cumulative, improper bolstering of Bays' testimony. The trial court allowed the testimony.
Section 90.801(2)(b), Florida Statutes (1995), allows a prior consistent statement to be used "to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication." Shellito contends that this exception is inapplicable here because the motive to fabricate arose before Bays made the post-arrest statement; that is, Bays was under arrest for armed robbery at the time he made his statement. We disagree. First, the motive to fabricate does not necessarily arise simply because the witness has been arrested and charged with a crime. See, e.g., Anderson v. State, 574 So.2d 87 (Fla.1991)(witness's prior consistent statements to police officer, given the night of her arrest but before her plea agreement, were admissible to rebut implication of recent fabrication because motive to fabricate arose after plea agreement); Edwards v. State, 662 So.2d 405 (Fla. 1st DCA 1995), review dismissed, 679 So.2d 772 (Fla.1996). Second, the questioning on cross-examination brought out information which made it appear that Bays had obtained details about the crime through newspaper articles and police reports, which were not written until after Bays had given the statement. Thus, as the trial court recognized, the officer's testimony was necessary to rebut the "inference of recent fabrication based on information obtained." However, even were we to conclude that the officer's testimony was erroneously admitted, we would find the error to be harmless. The officer's testimony was brief and at least two other witnesses testified that Shellito had bragged to them about committing the murder.
Next, Shellito asserts that the prosecutor's statement in the closing argument of the guilt phase deprived him of a fair trial. Specifically, he claims that the prosecutor improperly referred to Shellito's mother as "either an extremely distraught concerned mother or ... a blatant liar." Mrs. Shellito had testified at trial that Gill confessed to her that he had committed the crime and that she told a court employee about that confession. The court employee testified to the contrary.
No objection was made to the prosecutor's statements; thus, the issue was not properly preserved for review. Further, we do not find, as Shellito asserts, that the statement constitutes fundamental error. In fact, we do not find that the statements were erroneous. See Craig v. State, 510 So.2d 857, 865 (Fla.1987)(counsel's reference to witness as liar in commenting on witness's testimony was permissible argument as to prosecutor's view of the evidence). The record reflects that Mrs. Shellito's testimony was contradicted and that the prosecutor's statement was *842 made in the context of allowing the jury to determine her credibility.

PENALTY PHASE
Shellito's first penalty-phase argument is similar to his final guilt-phase argument in that he asserts that the prosecutor's remarks during the closing argument of the penalty phase deprived Shellito of a fair sentencing proceeding. Specifically, he claims that the prosecutor improperly made a lack-of-remorse argument, undermined the jury's discretion by implying that he had already made the decision required, argued committed-during-a-robbery and committed-for-financial-gain as two separate aggravating factors, denigrated the evidence in mitigation, and asked the jury to show Shellito no mercy. Only one of these assertions was properly preserved for review; that is, that the prosecutor improperly made a lack-of-remorse argument.
In his closing argument, the prosecutor argued:
What happened between the time that [Shellito] was bragging about the murder when he came back about 5:00, 5:30 in the morning and about 19 hours later when he was arrested and shot after assaulting a police officer with that nine millimeter, in between what was the defendant doing? Was he remorseful, was he horrified over having killed Sean Hathorne?

(Emphasis added.) Shellito objected to this argument, but the objection was overruled. Shellito contends that this improper argument warrants a new penalty phase proceeding.
We have clearly stated that lack of remorse is a nonstatutory aggravating circumstance and cannot be considered in a capital sentencing. Colina v. State, 570 So.2d 929 (Fla.1990); Trawick v. State, 473 So.2d 1235, 1240 (Fla.1985); Pope v. State, 441 So.2d 1073, 1078 (Fla.1983). However, on this record, we conclude that the brief reference to lack of remorse was of minor consequence and constituted harmless error. See, e.g., Wuornos v. State, 644 So.2d 1000, 1010 (Fla.1994)(brief reference to lack of remorse by prosecutor harmless error), cert. denied, 514 U.S. 1069, 115 S.Ct. 1705, 131 L.Ed.2d 566 (1995); Atwater v. State, 626 So.2d 1325 (Fla.1993); Sireci v. State, 587 So.2d 450 (Fla.1991).
Shellito argues next that the trial judge erred in instructing the jury on and in finding the aggravating factor of pecuniary gain. Shellito contends that the fact that he shot the victim because the victim had no money conclusively demonstrates that the taking of money or property was not the motive for the murder. The trial judge concluded otherwise and instructed the jury on the aggravating factors of commission for pecuniary gain and commission during the course of a robbery. He also gave the jury an instruction that these two aggravators were to be merged and considered as one aggravating factor if both were found. In finding these aggravating factors, the judge considered them as one aggravating factor.
The facts of this case reflect that Shellito stole a gun; told Gill and his girlfriend to let him out of the vehicle in which they were riding so he could "do some work to make money"; stopped the victim at gunpoint and demanded money; and shook the victim down, looking in his pockets for anything of value. Further, when the victim's body was found, the contents of his left front pants pocket were "pulled up" and "partially exposed." These facts reflect that Shellito initiated the criminal episode for pecuniary gain. We find no error in the giving of the instruction or the finding of this factor.
In his sixth and seventh claims, Shellito argues that the trial judge erred in refusing to give his requested clarifying instructions on mitigating evidence and on who bears the burden of proving that death is the appropriate penalty. We reject each of these claims. This Court has repeatedly determined that the requested clarifying instructions on mitigating evidence are not required. Finney v. State, 660 So.2d 674 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 823, 133 L.Ed.2d 766 (1996); Ferrell v. State, 653 So.2d 367 (Fla.1995). Likewise, we do not find that the standard instructions improperly shift the burden of proof. Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)(so long as state's method *843 of allocating burdens of proof does not lessen state's burden to prove existence of aggravating circumstances, defendant's constitutional rights are not violated by having to prove mitigating circumstances sufficiently substantial to call for leniency); Robinson v. State, 574 So.2d 108 (Fla.1991).
In his next claim, Shellito asserts that the trial judge failed to properly evaluate the evidence in mitigation. First, he contends that the trial judge erroneously found Shellito's age to be of little weight, and, second, that he failed to expressly evaluate, find, and weigh other factors in mitigation such as Shellito's learning disabilities, low IQ, and organic brain damage.
In evaluating Shellito's age, the trial judge stated the following:
At the time of the murder, the defendant was 6'4" tall, weighed 176 pounds and was 19 years of age. He is now 20 years old. He was and is a physically mature adult male. The murder victim, Sean Hathorne, was 18 years of age.
The defendant's criminal record started at age 13 in Juvenile Court. He was arrested 14 times as a juvenile and adjudged guilty of 4 felonies and committed to HRS. At age 16, he was certified from Juvenile Court to adult Felony Court for prosecution.
The defendant's total criminal records as a juvenile and as an adult shows that he has been arrested 22 times, has been charged with 30 separate crimes and has now been convicted of 8 felonies as an adult. He also has 4 felony convictions as a juvenile.
The defendant was on probation for 2 violent felonies at the time he committed this murder.
The PSI and testimony show that the defendant has been using alcohol and drugs since an early age.
The defendant stated in the PSI that he was primarily supported by "different ladies in the community."
Although young in years, the defendant is old in the ways of the world and vastly experienced in crime. Outlawry, his chosen vocation, and the largess of favored females has been his livelihood.
The defendant's age is a marginal mitigating circumstance and I assign it slight weight.
Shellito argues that the judge's conclusion that his age was to be given slight weight is erroneous because he was actually eighteen, not nineteen, at the time he committed the crime; drug and alcohol use is a sign of immaturity and is itself mitigating; physical maturity and lack of employment are irrelevant; and his past criminal history demonstrates immaturity rather than maturity. He also contends that the trial judge ignored other evidence relating to Shellito's emotional and intellectual maturity.
The State concedes that Shellito was one month shy of his nineteenth birthday when he committed the crime. The record reflects that, during the course of this case, both the State and Shellito's counsel referred to him as being nineteen at the time he committed the murder; however, his date of birth was presented to the judge and jury during the trial, and on a number of occasions he was properly referred to as being eighteen at the time of the murder. We conclude that the trial judge did not abuse his discretion in giving this mitigator only "slight weight." We have previously determined that, whenever a murder is committed by a minor, the mitigating factor of age must be found and weighed but that the weight can be diminished by other evidence showing unusual maturity. Ellis v. State, 622 So.2d 991, 1001 (Fla.1993). In this case, however, Shellito was no longer a minor. Where the defendant is not a minor, no per se rule exists which pinpoints a particular age as an automatic factor in mitigation. Peek v. State, 395 So.2d 492, 498 (Fla.1980). Instead, the trial judge is to evaluate the defendant's age based on the evidence adduced at trial and at the sentencing hearing. Id. For instance, in Cooper v. State, 492 So.2d 1059 (Fla.1986), we found that the trial judge acted within his discretion in rejecting the defendant's age of eighteen as a mitigator. See also Merck v. State, 664 So.2d 939, 942 (Fla.1995)(proper for court to reject as mitigating factor defendant's age of nineteen). Because the trial *844 judge was in the best position to judge Shellito's emotional and maturity level, on this record we will not second-guess his decision to accept Shellito's age in mitigation but assign it only slight weight.
Regarding the additional evidence in mitigation, Shellito argues that the trial judge erroneously failed to consider a number of factors in mitigation, including that Shellito is emotionally disturbed, is emotionally handicapped, has a low I.Q., has organic brain disorder, and had suffered a traumatic childhood. The trial judge found as follows regarding the mitigating evidence presented:
The defendant was raised in a stable, lower middle class home with his mother, older sister and brother. His father was an alcoholic, a career Navy man and was away from home on duty about half the time during which the children were growing up. However, the father did take the defendant fishing, go-carting and to the movies on occasion.
The father and mother have gone to Court with the defendant after each criminal episode and have counseled with him about the consequences of his behavior.
The father treated and disciplined all of the children the same. On three occasions, he struck or pushed the defendant but on one of those occasions, the defendant was screaming at the mother and the father stepped in to protect her.
The defendant did not do well when he started school and was put in a special education class.
His sister and brother excelled in school, both graduated from high school (the brother with honors) and both have become successful, law-abiding citizens. The brother is an E-4 in the Navy and the sister works at AT&T.
Much of the defendant's school problems were behavioral until he was finally dismissed from junior high school in the 8th grade and sent to a disciplinary camp after which he refused to return to high school. Since that time, he lived at home and could not or would not hold a job and set his own life style.
The defendant had a loving relationship with his mother, brother and sister. All children had the same advantages in the home and all were taught morality and the importance of the work ethic.
The defendant would frequently argue with his mother and have temper tantrums and threaten when he could not have his way.
Although he lived at home, he seldom worked and frequently was away, staying with friends and often got money from his mother so he could stay at motels with his girlfriends. He spent much time in the company of older women.
The defendant has, for short periods of time, been in several treatment and diagnostic facilities but without any specific diagnosis of mental illness or other disabling conditions.
This may be a marginal mitigating circumstance and I assign it slight weight. During the penalty-phase proceeding, Shellito presented no medical or other expert testimony to support his claims of organic brain damage or other impairment. Further, the evidence submitted to support his mental condition was conflicting.[4] In evaluating this evidence, the trial judge recognized that Shellito's father was an alcoholic and that Shellito did not do well in school; that he had been placed in a special education class; and that he had been in several treatment and diagnostic facilities without any specific diagnosis of mental illness or other disabling conditions. These inferences could be properly *845 drawn from the evidence introduced at trial. On this record, we cannot conclude that the trial judge abused his discretion in finding this mitigating evidence to be of slight weight. See, e.g., Williamson v. State, 681 So.2d 688 (Fla.1996)(trial judge acted appropriately within discretion when giving only some weight to mitigating circumstances related to defendant's childhood in light of conflicting evidence), cert. denied, ___ U.S. ___, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997).
Finally, Shellito contends that the death penalty in this case is disproportionate. He contends that this Court has refused to uphold the death penalty in cases involving similar aggravating and mitigating circumstances. In support of this argument, he cites to Livingston v. State, 565 So.2d 1288 (Fla.1988), and Wilson v. State, 493 So.2d 1019 (Fla.1986). In Livingston, we found the death penalty to be inappropriate. As in this case, the two valid aggravating circumstances were prior violent felony and commission during a robbery. However, unlike Shellito, Livingston was a minor at the time he committed the crime; he had suffered severe beatings and neglect as a child; and his intellectual functioning was marginal. In Wilson, we reversed the sentence of death because the murder, even though heinous, atrocious, or cruel, and even though the defendant had a prior violent felony, was the result of result of a heated, domestic confrontation. The facts of this case reflect that Shellito previously had been sentenced as an adult for a violent felony conviction and was on probation at the time he committed the murder, and that he committed three robberies and an aggravated assault on a police officer within days of the murder. Further, Shellito was not a minor; the evidence regarding his intellectual functioning indicated he was in the low average range of intelligence; and the evidence regarding his mental status was not supported by expert testimony and was conflicting. Under the circumstances of this case, we do not find the sentence to be disproportionate. See, e.g., Merck v. State, 664 So.2d 939 (Fla.1995); Hayes v. State, 581 So.2d 121 (Fla.1991).
Accordingly, we affirm Michael Shellito's conviction and sentence of death for first degree murder.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs as to conviction and concurs in result only as to sentence.
NOTES
[1] Gill did not testify in this proceeding.
[2] Shellito asserts that (1) the trial judge erred in admitting evidence of his attempt to flee from Gill's apartment during the police raid; (2) the trial judge erred in allowing a detective to testify about Bays' prior consistent statement; and (3) the prosecutor's statements in closing deprived him of a fair trial.
[3] Shellito raises the following penalty phase issues: (1) the prosecutor's remarks during the closing argument of the penalty phase deprived him of a fair sentencing proceeding; (2) the trial judge erred in instructing the jury on and in finding the aggravating factor of pecuniary gain; (3) the trial judge erred in refusing to give Shellito's requested instructions on mitigating circumstances; (4) the trial judge erred in refusing to give Shellito's requested instruction on who bears the burden of proving that death is the appropriate penalty; (5) the trial judge failed to properly evaluate the evidence in mitigation; and (6) Shellito's death sentence is disproportionate.
[4] Shellito introduced documents reflecting that he was diagnosed in 1991 as having "organic mental disorder," "conduct disorder undifferentiated," and "developmental language disorder." However, that same documentation reflects that he appeared to be well oriented in all areas, showed no signs of psychosis, and showed no impairment of concentration and memory. His school records indicate a history of behavioral problems and functioning levels of intelligence in the low average range, and his family members testified that he was placed in a foster home at a very young age for approximately thirty days when his mother was evicted from her home for nonpayment of rent and served time in jail. However, his family members also testified that he "was very quick on learning things and he took to mechanical repair really good," learned a work ethic from his mother and father, and was taught at home not to lie, cheat, or kill.