PER CURIAM.
Michael Wayne Shellito appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As explained below, we affirm the postconviction court’s denial of relief as to Shellito’s guilt phase claims. We reverse the postconviction court’s denial of relief as to Shellito’s claim of ineffective assistance of trial counsel at the penalty phase. Accordingly, we vacate the sentence of death and remand for a new penalty phase proceeding. We also deny his petition for writ of habeas corpus.
FACTS
Michael Shellito (“Shellito”) was convicted and sentenced to death for the murder of Sean Hathorne in Duval County. The facts of this case are set forth in Shellito’s direct appeal of his conviction and death sentence:
The State presented the following evidence at trial. On the evening of August 30, 1994, Shellito and a number of other individuals were staying at Stephen Gill’s apartment. Shellito left the apartment around midnight on August 30 and returned approximately an hour later. When he returned, he showed Ricky Bays a gun that he said he “got from a van” that night. Kevin Keyes, who lived about six miles from Gill’s apartment, had a .9 millimeter gun sto *449 len from his truck sometime after 10 p.m. on that same night.
Around 4 a.m. on August 31, Shellito and Gill took Gill’s girlfriend home in Gill’s mother’s white pickup truck. The girlfriend stated that, a block from her house, Shellito told Gill to let him out because he needed to “talk to someone.” Gill let Shellito out and took his girlfriend home. Gill and his girlfriend talked for five minutes and then he left.
About this same time, Michael Green was awakened by a noise in front of his home. When he looked out his window, he saw a white pickup truck in the road; saw the victim standing by the truck; heard a pop; and saw the victim spin around, run, and fall over by Green’s gate. By the time Green called 911, the truck was gone.
Police found the body of eighteen-year-old Sean Hathorne by Green’s front fence. The cause of death was a gunshot wound to the chest. A shell casing was found near the body.
Shellito and Gill returned to Gill’s apartment together around 5:30 a.m. At that time, Shellito told Ricky Bays that he shot someone after they dropped off Gill’s girlfriend. He told Bays that he saw a man walking down the street, stopped and shook him down, and, after determining that the man had no money, shot him. Shellito did not say whether Gill was involved, but Gill was present when Shellito related the story to Bays.
On the evening of August 31, a group was again gathered at Gill’s apartment. Shellito showed Latería Copeland and Theresa Ritzer a gun and told them both about the murder, stating that he told the victim he was “out of gas” just before he shot him.
That same night (in the early hours of September 1), police raided the apartment. Shellito jumped out a window and ran but was stopped by a police dog. After Shellito aimed a gun at an officer, officers shot and wounded him. The gun recovered from Shellito was identified as the gun that fired the shell casing found at the murder scene and that was stolen from Kevin Keyes’ truck the previous night.
In his defense, Shellito argued that the murder was committed by Gill. Shel-lito also emphasized that Bays was a convicted felon and had been in jail since the night of the raid on unrelated charges. Shellito also presented one of Bays’ cellmates, who stated that Bays had papers with him, including one that looked like a police report, and that Bays made an offer to him to “jump” Shellito’s case, i.e., trade information for a more lenient sentence. However, the story related by the cellmate about the murder at issue was totally inconsistent with the facts.
Shellito’s mother testified that Gill, whom she had met only once before, came to her house after Shellito was charged with the murder and confessed to her that he had committed the crime. Shellito’s father testified that he overheard parts of the conversation between Gill and Shellito’s mother and that he heard Gill say he told his attorney that he killed the victim. Although neither reported this story to the police until a week before trial, Mrs. Shellito stated that she thought she told a court employee about her conversation with Gill. On rebuttal, the court employee stated that she had a brief conversation with Mrs. Shellito, but that Mrs. Shellito said nothing about someone else having committed the murder.
Shellito also presented testimony from a witness who lived across the street from the murder site. The witness testified that around 4 a.m. he heard tires *450 screeching as if a vehicle had stopped suddenly, and he looked out a window and saw the shadow of a person moving around the back of a truck. The person appeared to be coming from the driver’s side of the vehicle and was not the person who was shot. On cross-examination, the witness admitted that he was not positive about this information and that he did not have on his glasses when he looked out the window.
Shellito was convicted as charged.
At the penalty phase proceeding, the State presented evidence that Bays and Shellito were convicted of two armed robberies they committed on the night of August 31 before the raid, and that Shellito was convicted for aggravated assault on a law enforcement officer (from the night of the raid) and for a March 1994 aggravated assault. Bays testified that Shellito held the gun to the victim’s head during both of the robberies. One of the victims related a similar story.
Shellito presented testimony that his father was an alcoholic and was in the Navy and away a lot; that, when Shelli-to was about two years of age, the State took custody of the children for a month while their mother was in jail; that Shellito stuttered badly as a child, was very loving, and was hit by his father on at least three occasions. Shellito’s mother testified that he was emotionally handicapped, had reading and psychological problems, had a learning disability, had organic brain disorder, and had tried to kill himself. A psychologist’s report from Shellito’s early childhood reflected that he had numerous problems as a child. Other reports showed that he had a low-to-average IQ, was learning disabled and emotionally handicapped, and suffered from organic mental disorder, conduct disorder, and developmental language disorder.
The jury recommended death by an eleven-to-one vote, which the trial judge followed. The judge found two aggravating circumstances (prior violent felony and pecuniary gain/committed during a robbery (merged)). In mitigation, he gave slight weight to Shellito’s age and background and character.[1]
Shellito v. State, 701 So.2d 837, 838-10 (Fla.1997) (footnote omitted), cert. denied, 523 U.S. 1084, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998). No additional evidence was offered at the Spencer[2] hearing. This Court affirmed Shellito’s murder conviction and sentence of death on direct appeal. Shellito, 701 So.2d at 845. Shellito moved for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851, which was denied by the postconviction court. Shellito now appeals this denial order and petitions this Court for a writ of habeas corpus.
ANALYSIS
Shellito raises the following eight issues in his appeal of the postconviction court’s denial of his 3.851 motion: (1) whether trial counsel provided ineffective assistance of counsel at the penalty phase; (2) whether trial counsel provided ineffective assistance of counsel at voir dire and at the guilt phase; (3) whether the State committed Brady or Giglio violations; (4) whether Shellito was rendered adequate mental health assistance under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (5) whether trial counsel provided ineffective assistance of counsel regarding prosecutor’s arguments at the penalty phase; (6) whether Shellito’s constitutional *451 rights were violated due to the preparation of the sentencing order; (7) whether Shel-lito’s due process rights were violated based on a trial witness’ contact with the jury; and (8) whether Shellito’s death sentence violates the Eighth Amendment.
Shellito also raises the following six issues in his habeas petition: (1) whether appellate counsel was ineffective in failing to raise a claim that the trial court erred in sentencing Shellito when it relied on materials not presented in open court; (2) whether appellate counsel was ineffective for not raising a claim that Shellito was absent from critical stages of his trial; (3) whether appellate counsel was ineffective for failing to raise a claim that evidence of Shellito’s prior convictions was inadmissible; (4) whether appellate counsel was ineffective for failing to raise a claim that the use of Shellito’s juvenile conviction as an aggravator violated Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); (5) whether appellate counsel was ineffective for failing to raise a claim that the trial court precluded Shellito from presenting mitigation in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); and (6) whether Florida’s death penalty statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We first consider Shellito’s ineffective assistance of trial counsel claims. We then address Shellito’s claims as they relate to the guilt phase.[3] Ineffective Assistance of Trial Counsel
Following the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Mungin v. State, 79 So.3d 726, 737 (Fla.2011); Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
There is a strong presumption that trial counsel’s performance was not deficient. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the chal *452 lenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id. In Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000), this Court explained that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” With these standards in mind, we now address Shellito’s claims of ineffective assistance of trial counsel.
I. Ineffective Assistance During Voir Dire
Shellito asserts that his trial counsel was ineffective for failing to question prospective jurors about “major issues,” such as drugs, alcohol, abuse, and mental illness. The postconviction court found that trial counsel’s decision to not question the prospective jurors with respect to their views on these subjects was tactical. Shel-lito was solely represented at trial by Re-fik Eler. Eler testified at the evidentiary hearing that Shellito’s case was one of his first capital appointments as lead counsel. Eler maintained that he made the strategic decision to not present evidence of Shellito’s alcohol and marijuana use at trial. Eler testified that in Duval County, in his experience, “the juror venire are not very sympathetic to [drugs and alcohol] as an excuse and even to an extent ... aggravation.” Shellito has failed to demonstrate that any selected juror was biased or had an animus towards the mentally ill or individuals with substance abuse problems. See Davis v. State, 928 So.2d 1089, 1117 (Fla.2005). Shellito has failed to demonstrate that Eler was ineffective in this regard.
Shellito also argues that Eler allowed selection of jurors who had friends or relatives employed by law enforcement and who possessed technical knowledge pertinent to the case. Shellito asserts that Eler was ineffective in failing to determine if the prospective jurors could disregard their specialized training. The postconviction court found Eler’s testimony—that he conferred with Shellito about the selection of jurors—to be “more credible and more persuasive” than Shellito’s allegations. The specialized training possessed by the particular jurors does not in and of itself rise to the level of a for cause challenge and does not demonstrate actual bias. Shellito’s claim is speculative. See Green v. State, 975 So.2d 1090, 1105 (Fla.2008) (“[A]n allegation that there would have been a basis for a for cause challenge if counsel had followed up during voir dire with more specific questions is speculative.”). Because Shellito has failed to prove that Eler was deficient during voir dire, we need not address the prejudice prong.[4] See Strickland, 466 U.S. at 697, 104 S.Ct. 2052.
II. Ineffective Assistance During Guilt Phase
Shellito claims that Eler was ineffective for failing to present sufficient evidence implicating Stephen Gill as the actual shooter. Shellito argues that Shellito’s mother’s testimony at trial that Gill confessed to the murder would have been substantiated had the defense investigator also testified. Eler testified at the eviden-tiary hearing that listing his investigator as a trial witness could have resulted in the revealing of facts and circumstances of the investigation. We find that Shellito *453 has not proven that Eler was deficient in this regard.[5]
Shellito contends that Eler was ineffective in failing to present evidence of Shellito’s alcohol and marijuana use to establish a voluntary intoxication defense.[6] The posteonviction court found that Eler made a tactical decision to not investigate or pursue an intoxication defense at trial. We note that several witnesses at the evi-dentiary hearing testified to Shellito’s daily use of alcohol and marijuana. However, because an intoxication defense would have been inconsistent with the defense’s theory that Shellito did not commit the murder, Eler made a reasonable, tactical decision to not pursue a voluntary intoxication defense. See Brown v. State, 894 So.2d 137, 146 (Fla.2004) (“Failure to present an intoxication defense cannot constitute ineffective assistance of counsel when the defendant asserts his innocence.”).
Shellito also claims that Eler was ineffective when he opened the door to Theresa Ritzer’s highly prejudicial testimony. On direct examination, Ms. Ritzer testified that Shellito confessed to her shortly after the murder. Eler attempted to discredit Ms. Ritzer’s testimony on cross-examination by having her admit that she failed to mention Shellito’s confession in her initial statement to the police. On redirect, however, Ms. Ritzer testified that Shellito held a gun to her head and said that if she talked then he would kill her because he had killed before. At the evidentiary hearing, Eler testified that it was very important for him to delve into this area and he did not anticipate opening the door to damaging evidence. The post-conviction court found that Eler’s decision to question Ms. Ritzer on this matter was tactical. We find that Shellito has failed to prove that Eler was deficient in his decision to impeach Ms. Ritzer after she had testified to Shellito’s murder confession. See Owen v. State, 986 So.2d 584, 553 (Fla.2008) (finding counsel not ineffective “for making a strategic decision to present evidence, even when in hindsight that decision opened the door to admission of evidence that is not entirely favorable to the defendant”).[7] Shellito has failed to prove that Eler was ineffective during the guilt phase.[8]
III. Ineffective Assistance During Penalty Phase
A. Deficiency
Shellito contends that he was provided ineffective assistance of trial counsel during the penalty phase based on Eler’s failure to adequately investigate and present mitigating evidence. Penalty phase claims of ineffective assistance of counsel are also reviewed under the two-prong test established by Strickland, and “[i]n reviewing a claim that counsel’s representation was ineffective based on a failure to investigate or present mitigating evidence, the Court requires the defendant to demonstrate that the deficient performance deprived the defendant of a reliable penalty phase proceeding.” Hoskins v. State, 75 So.3d 250, 254 (Fla.2011). In determining *454 whether the penalty phase proceeding was reliable, “the failure [of counsel] to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so.” Rose v. State, 675 So.2d 567, 571 (Fla.1996).
“It is unquestioned that under the prevailing professional norms ... counsel ha[s] an ‘obligation to conduct a thorough investigation of the defendant’s background.’” Porter v. McCollum, 558 U.S. 30, 39, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)); see also Hannon v. State, 941 So.2d 1109, 1124 (Fla.2006) (“Pursuant to Strickland, trial counsel has an obligation to conduct a reasonable investigation into mitigation.”). Moreover, counsel must not ignore pertinent avenues for investigation of which he or she should have been aware. See Porter, 558 U.S. at 40, 130 S.Ct. 447. “[I]t is axiomatic that ‘counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.’ ” Hurst v. State, 18 So.3d 975, 1008 (Fla.2009) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052). However, “[c]oun-sel’s decision not to present mitigation evidence may be a tactical decision properly within counsel’s discretion.” Hannon, 941 So.2d at 1124. This Court has found counsel’s performance deficient where counsel “never attempted to meaningfully investigate mitigation” although substantial mitigation could have been presented. Asay v. State, 769 So.2d 974, 985 (Fla.2000). We now apply these principles to counsel’s performance in this case.
On July 21, 1995, the jury convicted Shellito of the murder of Sean Hathorne, and the penalty phase commenced exactly one month later. In reviewing the mitigation evidence presented at the penalty phase, we stated on direct appeal:
Shellito presented no medical or other expert testimony to support his claims of organic brain damage or other impairment. Further, the evidence submitted to support his mental condition was conflicting. [FN] In evaluating this evidence, the trial judge recognized that Shellito’s father was an alcoholic and that Shellito did not do well in school; that he had been placed in a special education class; and that he had been in several treatment and diagnostic facilities without any specific diagnosis of mental illness or other disabling conditions. These inferences could be properly drawn from the evidence introduced at trial. On this record, we cannot conclude that the trial judge abused his discretion in finding this mitigating evidence to be of slight weight.
[FN: Shellito introduced documents reflecting that he was diagnosed in 1991 as having “organic mental disorder,” “conduct disorder undifferentiated,” and “developmental language disorder.” However, that same documentation reflects that he appeared to be well oriented in all areas, showed no signs of psychosis, and showed no impairment of concentration and memory....]
Shellito, 701 So.2d at 844 n. 4, 844-45.
The record reveals that on April 17, 1995, Eler moved for a confidential psychiatric evaluation of Shellito by Dr. Ernest Miller. In this motion, Eler raised the possibility of Shellito being mentally incompetent to proceed and insane. On April 17,1995, the trial court granted Shel-lito a confidential psychiatric evaluation.[9] *455 Eler testified at the evidentiary hearing that he conducted some of the penalty phase preparation during his guilt phase preparation. On June 26, 1995, Eler met with Shellito’s parents, and thereafter, he requested records from Charter Hospital, Grant Center Hospital, Baptist Hospital, the Naval Hospital of Jacksonville, and Dr. Angeles Alvarez-Mullin.[10] On August 15, 1995, Eler’s office requested records from the Duval County School Board. Additionally, on August 15, 1995, Eler received documents from Dr. Mullen’s office. Eler testified that by August 16, 1995, he would have received the Naval Hospital records. On August 17, 1995 — four days before the penalty phase commenced — the investigator for the defense obtained records from Baptist Hospital, Charter Hospital, and the Duval County School Board.
According to his testimony at the evi-dentiary hearing, Eler’s decision not to have Dr. Miller testify at the penalty phase was based on his conversation with Dr. Miller on August 16, 1995.[11] Eler noted the consequences of having a defense expert testify during the penalty phase: cross-examination would have revealed a significant amount of negative information[12] and all of Shellito’s records could have been admitted by the State. In addition, Eler cited to expert rebuttal testimony offered by the State, if the defense proceeded with having an expert testify. Having reviewed the records, Eler testified that he made the strategic decision to choose to present some of the records. Eler explained that through the testimony of Shellito’s family members, the jury would be informed of Shellito’s mental issue.[13] Eler also testified that he also spoke to Dr. Elias Sarkis about organic brain disorder; however, Dr. Sarkis testified at the evidentiary hearing that the consultation involved the issue of insanity and that Eler did not ask about mitigation.
The postconviction court did not find Eler ineffective, reasoning that it was within the wide range of professional judgment for Eler to make a tactical decision to have certain aspects of Shellito’s background presented at trial through family *456 members. We conclude, however, that Shellito has satisfied his burden of showing that Eler’s performance in mounting a limited investigation and presentation of Shel-lito’s substantial mental health problems was “unreasonable under prevailing professional norms.” Arbelaez v. State, 898 So.2d 25, 34-35 (Fla.2005) (quoting Valle v. State, 778 So.2d 960, 965 (Fla.2001)).
As previously noted, this was one of counsel’s first capital cases where he was lead counsel and handled both the guilt and penalty phases of the trial. He was appointed to represent Shellito on February 22, 1995. While counsel indicated that he conducted some preparation for the penalty phase during the guilt phase, the record shows that counsel met with the defendant’s parents on June 26, 1995, shortly before the guilt phase of the trial began. It was after the guilt phase, during the month of August 1995, that counsel sought and obtained medical and school records for a penalty phase that began on August 21, 1995. The reports indicated that Shellito had some mental health issues. Although Dr. Miller, who had performed a competency evaluation, was consulted at this point, there was no true follow-up on the matters indicated in the various reports. Yet counsel made a marginal attempt to present organic brain damage and other impairment as mitigation.
Under these circumstances, Eler was deficient in failing to follow up with the indications of Shellito’s mental health issues, and in failing to have Shellito’s mental health issues presented by an expert at trial to explain their significance and impact on his behavior at the time of the murder. Having determined that Shellito has satisfied the deficiency prong, we now consider the prejudice prong.
B. Prejudice
Shellito asserts that the mitigation presented at the evidentiary hearing was qualitatively and quantitatively different from that presented at trial. “Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggrava-tors found by the trial court.” Hurst, 18 So.3d at 1013. That standard does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter, 558 U.S. at 44, 130 S.Ct. 447 (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). “To assess that probability, [the Court] consider[s] ‘the totality of the available mitigation evidence ... ’ and ‘reweig[hs] it against the evidence in aggravation.’ ” Id. at 41, 130 S.Ct. 447 (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). We now review the evidence adduced during the evidentiary hearing.
Evidentiary Hearing
No mental health mitigation, statutory or otherwise, was considered or found by the trial court. Yet, at the postconviction evidentiary hearing, the defense presented mental health evidence that could have been presented to the penalty phase jury. Dr. William Riebsame, a psychologist, evaluated Shellito in May of 2004. At the evidentiary hearing, Dr. Riebsame opined that Shellito’s organic brain damage probably occurred after choking on milk when he was just a few days old. According to Dr. Riebsame, this incident might have been a precursor to the cognitive difficul *457 ties Shellito experienced during his lifetime, and Shellito’s learning disability probably reflected the organic brain damage. Dr. Riebsame conducted a neuropsy-chological test, finding that Shellito had at least mild to moderate impairment in a variety of frontal lobe functions, but later stated that he was within the average to moderate impairment range. Dr. Rieb-same diagnosed Shellito with bipolar disorder not otherwise specified, which may have resulted from organic brain damage.
Dr. Riebsame opined that at the time of the murder, Shellito was under the influence of extreme mental or emotional disturbance based on his organic brain dysfunction, mood disorder, and erratic behavior which could have been a function of his bipolar disorder, and that Shellito’s ability to appreciate and conform his conduct to the requirements of the law was impaired. Dr. Riebsame also opined that at the time of the murder, Shellito had a mental age of fourteen or fifteen years, an emotional age of twelve or thirteen years, an IQ in the low-average range, the presence of organic brain damage, erratic mood swings that often precipitated either depressed episodes that caused suicide attempts or manic episodes that led to aggression, impulse control problems, alcohol dependence, cannabis abuse or dependence, and personality dysfunction or disorder. Dr. Riebsame noted a history of cognitive disorder and antisocial personality, a prior head injury, verified physical and sexual abuse, and that Shelli-to’s parents contributed to the abuse experienced by Shellito.
Postconviction counsel had Shellito undergo a Positron Emission Tomography (PET) scan of his brain on August 4, 2004. Dr. Joseph Wu, a psychiatrist, testified at the evidentiary hearing as to his findings after he had reviewed the PET images: abnormalities in the ratio of activity between the different regions, which falls outside of the range of normal variability and is consistent with a brain abnormality; an abnormality in the asymmetry between the left and right side of the temporal lobe areas which is significantly outside the range of normal variability; less activity in the left temporal lobe than in the right temporal lobe; an abnormality in the front and back ratio; and an abnormality in the frontal lobe (which involves the abilities to exercise proper judgment and to inhibit acting out inappropriate impulses). Dr. Wu opined that the images were not inconsistent with a bipolar diagnosis or a diagnosis of organic brain damage.[14]
Dr. Sarkis, who was Shellito’s attending psychiatrist at Grant Center Hospital in October 1991, testified at the evidentiary hearing that Shellito was referred to the Grant Center because of his behavioral problems, including arson, suicidal and homicidal threats, and running away. Dr. Sarkis’ conclusion was that Shellito has organic brain syndrome, that he was three to seven years behind in his chronological age, and that his IQ was below average. Dr. Sarkis opined that Shellito qualified as having severe mental or emotional disturbance. Shellito’s brain deficit causes impulsive aggression and very poor planning ability, that his ability to make decisions is significantly impaired by his impulsivity, and that his cognitive faculties have never been intact.
Dr. Craig Beaver, a psychologist, examined Shellito in May 2002. Dr. Beaver testified at the evidentiary hearing that Shellito met the criteria for organic brain *458 syndrome and cognitive dysfunction. Dr. Beaver noted Shellito’s significant early developmental delay, substantial emotional and behavioral problems, and that his IQ was below average. Dr. Beaver also cited Shellito’s mood regulation disorder, his problems with depression and emotional control reflective of bipolar disorder and personality difficulties secondary to organ-icity, a history of drug and alcohol abuse, an abusive and very neglectful environment, and suicide attempts. Dr. Beaver testified that the organicity and neglect in his family caused Shellito’s antisocial behavior. Dr. Beaver opined that at the time of the murder Shellito was suffering from an extreme emotional disturbance and had significant limitations on his ability to conform his behavior or appreciate the fact that one of the consequences of armed robbery could be that someone might get killed.
Fact witnesses also testified at the evi-dentiary hearing. Shellito’s older sister, Rebecca, testified that Shellito hit his head against the wall when he got mad, was depressed, talked like a nine-year-old when he was actually thirteen, was called “retarded,” and wet the bed until the time he went to prison. Rebecca testified about Shellito’s mother’s infidelities. Shellito’s mother would leave her children at home without arranging for supervision or food for at least a day or two at a time. Rebecca recalled coming home from school and seeing three-year-old Shellito home alone. Rebecca also testified that one time when Shellito’s mother was pulled over by a police officer, everyone had to eat marijuana, including Shellito who was eight years old at the time. Shellito’s mother would hit the children with her hands, shoes, hangers, and electric cords. While drinking with her friends, Shellito’s mother would announce that she would make her children dance and then proceed to hit them with a cord. Shellito’s mother arranged for a man to move into her home to watch her children despite knowing that he had molested his sisters. Thereafter, this man molested Rebecca for two years. Shellito’s mother told Shellito to let her see his penis. Shellito’s mother would tell Shellito to act like a baby and he would put his head in her lap. She would then expose her breast and hit him with it. Shellito’s mother would say to her children that she wished she never had them, and that they ruined her life. Shellito’s mother would hit their father in the presence of their children. Shellito did not spend time with his father unless he was being whipped.
Allison Winnicki, Shellito’s kindergarten teacher, testified that Shellito was emotionally handicapped, had mood swings, was a loner, ate glue and paper, and would be fine one minute but then something would come over him that he could not control. Shellito would sit on her lap and cry sometimes and say that he did not want to be like he was but that he could not help himself. Ms. Winnicki had a very close bond with Shellito, which was the one stability he had in his life. Ms. Winnicki heard from a neighbor that Shellito would scavenge for food, sometimes in garbage cans, and roam late at night. An investigator for Shellito’s postconviction counsel testified at the evidentiary hearing that in March 2003, she spoke to Ms. Johnnie McKinsey, who, from 1982 to 1987, was Shellito’s elementary school special education teacher in a class for emotionally handicapped students. Ms. McKinsey told the investigator that she saw signs of abuse or neglect, that Shellito was not able to work at the appropriate grade level, and that he came to school hungry, dirty, in need of a lot of attention, and was easily frustrated. Ms. McKinsey referred Shelli-to to counseling.
*459 Other witnesses testified that Shellito’s mother smacked her children, was verbally abusive, had issues with drinking and used marijuana regularly, and was very depressed and emotional. There was a lack of structure in the home. As to Shellito, witnesses described him as being mentally disturbed with behavioral and emotional issues, a loner and follower, immature, quick-tempered, unstable, frustrated, appeared to be on psychiatric medicine, defiant, prone to temper tantrums and fighting, and would run away. Shellito was picked on for stuttering and called a “dummy” and “slow.” Shellito was observed drinking alcohol heavily every day until he passed out and smoking marijuana daily including using both the night of his arrest. According to one witness, the alcohol and drugs began to adversely affect him at eighteen years old.
This postconvietion evidence shows a different picture of Shellito’s upbringing than what was presented at trial. See Shellito, 701 So.2d at 844 (“The defendant was raised in a stable, lower middle class home with his mother, older sister and brother.”) (emphasis added). We conclude that based on consideration of the plethora of available mitigation and the dearth of mitigation actually presented, when reweighed against the aggravation in this case,[15] our confidence in the outcome of the penalty proceeding is undermined. Thus, Shellito has satisfied the prejudice prong of Strickland. Accordingly, we vacate the sentence of death and remand for a new penalty phase proceeding.
Brady and Giglio
Shellito asserts claims under both Brady[16] and Giglio.[17] Such claims present mixed questions of law and fact. See Sochor, 883 So.2d at 785. This Court defers to the lower court’s findings of fact if they are supported by competent, substantial evidence. See Hurst, 18 So.3d at 988. This Court reviews the trial court’s application of the law to the facts de novo. Id.
To meet the requirements of Brady, a defendant must show that “(1) favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (8) because the evidence was material, the defendant was prejudiced.” Parker v. State, 89 So.3d 844, 865 (Fla.2011). Shelli-to suggests that the State’s decision in no longer seeking to prosecute Bays as a Habitual Violent Felony Offender (“HVFO”) in his armed robbery case was in exchange for Bays’ testimony during Shellito’s trial. By the time Bays testified at Shellito’s trial, the State withdrew its notice of intent to prosecute Bays as an HVFO. Contrary to Shellito’s assertion, the record reveals that there was no agreement entered into between Ricky Bays and the State whereby Bays’ testimony in Shellito’s murder trial was agreed to be offered in consideration for the State’s disposition of Bays’ armed robbery case.[18] *460 As there was no promise or agreement demonstrated by Shellito — other than the negotiated plea agreement Bays and the State entered into after the disposition of Shellito’s case — there was no “favorable evidence” in violation of Brady. Accordingly, Shellito has failed to establish a Brady violation.
Shellito contends that the State committed a Giglio violation due to the State’s filing of the withdrawal notice of its intent to prosecute Bays as an HVFO. To establish a violation of Giglio, a defendant must prove: “(1) that the testimony was false; (2) that, the prosecutor knew the testimony was false; and (3) that the statement was material.” Robinson v. State, 707 So.2d 688, 693 (Fla.1998). Gig-lio stands for the proposition that a prosecutor “has a duty to correct testimony he or she knows is false when a witness conceals bias against the defendant through that false testimony.” Routly v. State, 590 So.2d 397, 400 (Fla.1991). “[T]he thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and the prosecutor not fraudulently conceal such facts from the jury.” Robinson, 707 So.2d at 693.
Bays testified during the guilt phase that it was his understanding that his maximum possible penalty was life imprisonment in his armed robbery case; that he was not promised anything for his testimony by the State Attorney’s office or by the police; and that he understood that he could also receive a fifteen-year minimum mandatory sentence. Shellito contends that Bays testified falsely at trial when he said he was not receiving any benefit for his testimony. However, such statement was not false as the evidentiary hearing was devoid of evidence of an agreement for the withdrawal of HVFO, or any other benefit, in consideration for Bays’ testimony. Shellito also argues that Bays testified falsely at trial when he was facing life in prison due to his status as a habitual offender. However, there was no mention of “habitual offender” status during Bays’ testimony. In addition, Bays’ testimony that he was facing life in prison was not untrue since even without the habitual offender status, Bays was still facing a life sentence. See McDonald v. State, 957 So.2d 605, 613 (Fla.2007) (“Pursuant to section 812.13(2)(a), Florida Statutes (2000), armed robbery is a felony punishable by life.”). Shellito contends that Bays testified falsely at trial when he said he was facing a fifteen-year mandatory minimum. We agree that such testimony was false. False evidence is material “if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.” Guzman v. State, 868 So.2d 498, 506 (Fla.2003) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). We find that there was no reasonable likelihood that this false testimony could have affected the guilty verdict. Accordingly, a Giglio violation was not committed during Shellito’s trial.
Trial Witness’ Contact with the Jury
Shellito claims that Debra Dlugosz, who served as both a trial witness and trial court clerk, communicated with the jury in violation of Shellito’s due process rights. During the State’s rebuttal, Dlugosz testified that Shellito’s mother did not tell her that someone else confessed to the murder. Dlugosz testified at the evidentiary hearing that she resumed her functions as clerk after testifying in Shellito’s trial. Dlugosz stated that besides being a witness and performing her duties as a court *461 clerk, she had no other interactions with the jury. In denying this claim, the post-conviction court found that the record failed to support Shellito’s claim that anyone had inappropriate contact with the jury. Because Shellito has failed to demonstrate that Dlugosz had improper contact with the jury which deprived him of his due process rights, we deny this claim.
Habeas Issue
Shellito claims that appellate counsel on direct appeal was ineffective in failing to raise a claim that Shellito was absent during critical stages of his trial. We note that a defendant has a constitutional right to be present at all “crucial stages of his trial where his absence might frustrate the fairness of the proceedings.” Garcia v. State, 492 So.2d 360, 363 (Fla.1986). “However, the right ‘does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relative to the case is discussed.’ ” Orme v. State, 896 So.2d 725, 738 (Fla.2005) (quoting United States v. Vasquez, 732 F.2d 846, 848 (11th Cir.1984)).
Shellito points out that during the guilt phase, outside of the presence of the jury and Shellito, an investigator from the State Attorney’s office informed the trial judge that witnesses had told him that they overheard two women saying they were going to get the names and addresses of all of the trial witnesses and pay them a visit. The women denied making any threats. The trial judge said that he observed them chatting and shaking their heads during the testimony and warned them that they would be excluded from the courtroom if any nodding continued. The trial judge also warned them of the penalty of contempt of court if they talked to any of the witnesses. The jury was then brought back into the courtroom with Shellito still absent. The jury was excused again for a short recess. Shellito also asserts that he was absent when his trial counsel agreed to have the judge talk privately about a juror’s scheduling conflict.
We conclude that Shellito has failed to sufficiently demonstrate that he was absent from critical stages of his trial which might have frustrated the fairness of his trial. Shellito “could have provided no useful input” had he been present. Seibert v. State, 64 So.3d 67, 86 (Fla.2010). Shellito’s appellate counsel cannot be deemed ineffective for failing to raise a meritless claim. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (“[T]he failure of appellate counsel to raise [a] merit-less issue will not render appellate counsel’s performance ineffective.”).
CONCLUSION
Based on the foregoing, we affirm in part and reverse in part the circuit court’s amended order denying Shellito’s motion for postconviction relief. We affirm the trial court’s denial of relief as to the guilt phase but vacate the sentence of death and remand for a new penalty phase proceeding. We deny his petition for a writ of habeas corpus.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. At the time of the murder, Shellito was one month shy of nineteen years of age.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Because we vacate Shellito's sentence of death and remand for a new penalty phase proceeding, we do not address the remaining claims raised concerning Shellito’s sentence and penalty phase proceeding.

. We deny Shellito’s conclusory assertion that Eler was deficient when he stipulated to striking for cause certain prospective jurors based on their death penalty views.

. We also deny Shellito’s claim that Eler was ineffective in failing to impeach John Bennett on his prior inconsistent statement which would have suggested that Gill was the shooter.

. Voluntary intoxication was recognized as a defense at that time of the murder.

. We reject Shellito's claim that Eler should have moved for a hearing under Richardson v. State, 246 So.2d 771 (Fla.1971), concerning Ms. Ritzer’s prior statement. See Brown v. State, 640 So.2d 106, 107 (Fla. 4th DCA 1994).

. We deny Shellito's claim that Eler was ineffective in failing to recall Detective Hinson.

. Dr. Miller evaluated Shellito on April 21, 1995. In his report, Dr. Miller opined that Shellito was competent to proceed, not insane at the time of the murder, and did not meet the criteria for commitment. Dr. Miller noted, in his report, Shellito’s alcohol and drug *455 usage. Eler rejected the strategy of presenting Shellito's drug and alcohol use as mitigation.

. It should be noted that Eler again requested records from Baptist Hospital, Charter Hospital, the Naval Hospital, Dr. Alvarez-Mullin on August 10, 1995 — eleven days before the start of the penalty phase.

. On the day of this conversation, Eler faxed Dr. Miller a copy of Grant Center Hospital's one-page discharge summary related to Shel-lito. Eler maintained that Shellito's brain disorder was specifically discussed during the conversation. According to Eler, both he and Dr. Miller were aware of Shellito's organic mental disorder, developmental language and reading disorder, the taking of Tegretol, conduct disorder, a history of aggressive behavior, and homicidal and suicidal threats.

. The negative information which Eler did not want the jury to consider included as follows: Shellito was competent, he knew right from wrong, he was able to appreciate the crime, he remembered clearly the events of the crime and was not under the influence, he was a manipulator, he functioned well with neither mental impairment nor an indication of significant neurological impairment, he suffered from oppositional defiant disorder and antisocial personality disorder, he was prescribed medicine used to treat agitation and aggression, his criminal history, he had threatened to shoot himself in the past, he had problems with his mother, he was unable to conform to inmate housing, he had demonstrated certain above-average skills and activities, and he was compliant and showed good control.

.Some of the psychological, medical, and drug treatment records from Charter Hospital, Grant Center Hospital, Baptist Hospital, Naval Hospital, Dr. Alvarez-Mullin, as well as Shellito's school records, were entered into evidence in the penalty phase.

. The State offered the testimony of Dr. Lawrence Holder, who also reviewed Shelli-to's scan. In rebutting Dr. Wu’s testimony, Dr. Holder, finding no single abnormality, concluded that Shellito’s scan was normal.

.The trial judge found two statutory aggra-vators: (1) prior violent felonies and (2) pecuniary gain/committed during a robbery (merged). Shellito, 701 So.2d at 840. The State presented evidence at the penalty phase that Shellito was convicted of two armed robberies committed on the night of August 31 before the raid, an aggravated assault on a law enforcement officer that occurred the night of the raid, and an aggravated assault that occurred in March 1994. Id. at 839.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

. Jay Plotkin, the trial prosecutor, testified that he personally filed the withdrawal notice in Bays’ armed robbery case because Bays did not qualify as an HVFO. Plotkin also testified that Bays was cooperative "from the minute *460 he was arrested” as demonstrated by his statement to the police.